**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PROFESSIONAL DRUG COMPANY, INC. and FWK HOLDINGS, LLC, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| NOVO NORDISK INC., ELI LILLY AND COMPANY, SANOFI-AVENTIS U.S., LLC, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs Professional Drug Company, Inc. ("PDC") and FWK Holdings, LLC ("FWK"), (collectively, "Plaintiffs"), individually and on behalf of all other persons and entities similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation conducted by and through Plaintiffs' attorneys. That investigation included, among other things, review of: Defendants' public statements; U.S. federal and state government filings and reports; filings and submissions in *In Re Insulin Pricing Litig.*, C.A. No. 3:17-cv-0699-BRM-LHG (D.N.J.); news reports and wire and press releases published by and regarding the defendants in this action and the analog insulin drug market; and information obtainable through open source materials. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein following a reasonable opportunity for discovery.

## I.  SUMMARY OF CLAIMS

1.      Plaintiffs bring this action against three manufacturers of analog insulin medications—Eli Lilly and Company ("Lilly"), Novo Nordisk Inc. ("Novo"), and Sanofi-Aventis U.S., LLC ("Sanofi" and, collectively with Novo and Lilly, "Defendants").

2.      Plaintiffs assert claims on behalf of themselves and a class (the "Class") of pharmaceutical distributors that directly purchased the analog insulin drugs NovoLog® ("NovoLog"), Humalog® ("Humalog"), Lantus® ("Lantus"), and Levemir® ("Levemir") from the Defendants during the period January 1, 2009 through the present (the "Class Period"). During the Class Period, PDC purchased Lantus directly from Defendant Sanofi on February 10, 2009 and May 15, 2009 and purchased Levemir directly from Defendant Novo on June 16, 2010. Based on information currently available, during the Class Period, FWK purchased approximately $113,143,774.13 of Lantus directly from Defendant Sanofi, approximately $25,455,136.10 of Levemir and $64,418,385.92 of NovoLog directly from Defendant Novo, and approximately $45,419,536.95 of Humalog directly from Defendant Lilly.  All of those purchases came at prices dictated by the Defendants.

3.      Plaintiffs seek to recover damages incurred by themselves and the members of the Class ("Class Members") due to the scheme that Defendants and their co-conspirators perpetrated to artificially inflate the prices of analog insulin drugs that Class Members directly purchased from Defendants (the "Price Inflation Scheme").

4.      Defendants conducted their Price Inflation Scheme through repeated acts of mail and wire fraud that amounted to a pattern of racketeering activity in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and New Jersey's Racketeer Influenced and Corrupt Organizations Act ("New Jersey RICO"),

N.J.S.A. § 2C:41-1 *et seq.*  Defendants' false representations concerned the distributor and retail prices of Humalog, NovoLog, Lantus, and Levemir.

5.      To ensure the success of the Price Inflation Scheme, Defendants conspired and formed RICO enterprises with the three largest pharmacy benefit managers (the "PBM Conspirators")—CVS Health Corporation ("CVS"), Express Scripts, Inc. ("Express Scripts"), and OptumRx, Inc. ("OptumRx").

6.      During the Class Period, the PBM Conspirators were responsible for managing the prescription medication benefits maintained by roughly 180 million Americans, or 80% of the insured public.

7.      While the Class Member drug distributors sell other pharmaceutical products to pharmacies directly, PBMs determine the prices insurers ultimately pay for those medications.

8.      The PBM Conspirators fulfill that role by negotiating directly with Defendants and other drug manufacturers on behalf of health insurers to determine the real retail prices of analog insulins and other pharmaceuticals.  The PBM Conspirators set the retail price of analog insulins by negotiating discounts from the average wholesale prices ("AWP"), or "benchmark" prices, that manufacturers such as Defendants publish with respect to their products.

9.      During the Class Period, Defendants employed the RICO enterprises that they formed with the PBM Conspirators to enrich themselves at the expense of: (a) Class Members who paid for their analog insulins based on the fraudulently inflated distributor list prices ("Distributor Prices") Defendants published; and (b) consumers who paid for their analog insulins based upon the fraudulently inflated AWP or benchmark price that is commonly utilized to calculate consumers' contributions to their prescription medication costs (the "Defrauded Consumers").

10.     Pursuant to their Price Inflation Scheme, Defendants separately conspired with each of the PBM Conspirators to widen the secret spread between Defendants' published benchmark prices for their analog insulin drugs and the undisclosed net selling prices that the PBM Conspirators agreed to pay for prescriptions of Defendants' analog insulin drugs filled by consumers.

11.     That spread was significant to the PBM Conspirators because it determines the compensation that they receive from their health insurer clients.

12.     Specifically, after consumers purchased Defendants' analog insulins (or other medications) at physical or online pharmacies, Defendants paid the PBM Conspirators "rebates" equal to the difference between Defendants' published AWP prices and the negotiated "net selling prices" secretly agreed upon by Defendants and the PBM Conspirators.

13.     The PBM Conspirators then gave a portion of the rebate to their health insurer clients, keeping the remainder for themselves.

14.     Thus, the larger the spread between a drug's benchmark and net price, or the higher the absolute benchmark price, the larger the PBM Conspirators' profits.

15.     Throughout the Class Period, Defendants agreed to advance the financial interests they shared with the PBM Conspirators by inflating the spreads applicable to Defendants' analog insulins.

16.     That pricing strategy directly served the PBM Conspirators' interests in augmenting the payments they received for purportedly negotiating with Defendants to receive discounts from their analog insulins' benchmark prices.

17.     Promoting the PBM Conspirators' interests in that manner also served Defendants' financial interests because the PBMs play a critical role in determining which

medications receive favorable treatment on the lists of approved medications, or "formularies," that PBMs create for their insurer clients.

18.     When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the analog insulins), a PBM is in the position to exclude one of the medications from the PBM's formulary, or at least to place that medication in a non-preferred position on the formulary.

19.     When a drug is excluded from a formulary or placed in a non-preferred position, health insurers using that formulary will make their plan beneficiaries shoulder a greater percentage, or all, of the disadvantaged product's cost.

20.     As a result, in the branded analog insulin therapeutic category, the PBM Conspirators can employ formulary placement to push a significant volume of sales toward or away from particular products.

21.     In a well-functioning, non-fraudulent market for products like Defendants' analog insulins, the PBM Conspirators would exercise the leverage they possess by virtue of their role in creating formularies to negotiate real price discounts from drug manufacturers, including Defendants.

22.     In other words, the PBM Conspirators should negotiate discounts or rebates that lower the manufacturers' net selling prices and then use those reductions as legitimate bases to confer formulary status to the least costly medication.

23.     Throughout the Class Period, however, Defendants employed their Price Inflation Scheme: (a) to eliminate the PBM Conspirators' incentive to negotiate real price decreases; and (b) to avoid competing with each other based upon their analog insulins' Distributor Prices or net selling prices.

24.     By inflating the benchmark prices of their analog insulins, Defendants provided the PBM Conspirators with significantly greater spreads that the PBMs utilized to enhance the compensation they received from their insurer clients, purportedly for "negotiating" rebates from legitimate benchmark prices.

25.     As a quid pro quo for Defendants' assistance, the PBM Conspirators provided Defendants with favorable formulary placements for their analog insulins that served to maintain the enormous profits that Defendants generated from those medications.

26.     Indeed, throughout the Class Period, each Defendant incrementally raised its benchmark prices just slightly more than its competitors while making roughly equivalent offsetting payoffs to the PBM Conspirators.  That tactic induced the PBM Conspirators to keep the insulin manufactured by the Defendants generating the largest spreads on the PBM Conspirators' formularies or in a preferred formulary position.

27.     In effect, the Price Inflation Scheme allowed Defendants to trade the inflated benchmark prices that enhanced the PBM Conspirators' bottom lines for the preferred formulary positions that augmented Defendants' profits.

28.     As a result, formulary decisions for analog insulins are increasingly made based on inflated benchmark prices (and corresponding spread inflation) that pad the PBM Conspirators' profits, rather than Distributor Prices, net prices, or the safety and efficacy of the analog insulins.

29.     While Defendants and the PBM Conspirators profited handsomely from their Price Inflation Scheme, Defendants' conduct caused Class Members to pay considerably higher Distributor Prices to purchase analog insulins from Defendants.

30.     Unbeknownst to Class Members, Defendants utilized a substantial portion of the payments received from Class Members to fund the kickbacks to the PBM Conspirators that were required to maintain favorable formulary positions.

31.     Defendants' Price Inflation Scheme also damaged Defrauded Consumers, who include uninsured patients, patients in high deductible health plans, patients in Medicare Part D plans, and patients with coinsurance obligations.

32.     In contrast to the PBM Conspirators and their insurer clients, the Defrauded Consumers made payments for analog insulins at the point of pharmacy sale that equaled a percentage—or even the full—fraudulently inflated benchmark prices.  Thus, the Defrauded Consumers' contributions to their analog insulin prescriptions bore no relationship to the actual net selling prices the PBM Conspirators agreed to pay on behalf of the consumers' insurers.

33.     In fact, Defendants' continual fraudulent escalation of the Distributor Prices and benchmark prices of their analog insulins increased the profits that they and the PBM Conspirators generated while simultaneously siphoning more and more money from Class Members and the patients who need those medications to survive.

34.     Over time, the Defendants have engaged in an arms race of false Distributor Price and benchmark price increases to the detriment of Class Members and consumers alike.

35.     Between 2014 and 2019, for example, Defendants raised the benchmark prices for their analog insulins by over 150%.  Those dramatic increases occurred in virtual lockstep. Benchmark prices that were roughly $75 a decade ago are now between $300 and $700.

36.     Because of Defendants' Price Inflation Scheme, the Distributor Prices paid by Class Members to purchase Defendants' analog insulins experienced similar unjustifiable growth.

7

37.     Those dramatic increases have occurred despite the absence of *any* change in Defendants' analog insulins.

38.     Defendants' false representations defrauded Class Members, who had no reason to believe that the Distributor Prices that Defendants quoted were inflated to fund the kickback payments to the PBM Conspirators.

39.     Likewise, because Defendants repeatedly announced their fraudulently inflated benchmark prices for analog insulin publicly, while concealing their net prices, the Defrauded Consumers reasonably believed that the benchmark prices on which their out-of-pocket payments were based were reasonable and fair approximations of the actual cost of their analog insulins.

40.     Had Defendants published Distributor Prices and benchmark prices that reasonably approximated their analog insulins' true costs, Plaintiffs, Class Members, and the Defrauded Consumers would have paid much less for the analog insulins they purchased.

41.     The Class Members' damages therefore arise as a direct and proximate result of Defendants' Price Inflation Scheme, which they perpetrated through acts of mail and wire fraud that amount to a pattern of racketeering activity under the federal RICO and New Jersey RICO statutes.

42.     Pursuant to the terms of those statutes, Defendants are liable to the Class Members for damages, treble damages, and the costs and attorneys' fees incurred in prosecuting this action.

## II.  JURISDICTION AND VENUE

43.     This Court has jurisdiction over the subject matter of this action pursuant to 18

U.S.C. § 1965 and 28 U.S.C. §§ 1331 and 1337.

44.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C.

§ 1391(b) and (c) because, during the Class Period, Defendants: (a) resided in this District;

(b) transacted business in the United States, including in this District; (c) were found in this

District; and (d) maintained agents here.

45.     Courts in this District are already adjudicating parallel class action litigation

commenced by consumers who have sued Defendants for perpetrating their Price Inflation

Scheme.  *See In re Insulin Pricing Litig.*, No. 17-0699 (BRM)(LHG) (D.N.J.).

46.     During the Class Period, Defendants sold and shipped analog insulin drugs in a

continuous and uninterrupted flow of interstate commerce, which included sales of analog

insulin drugs in this District and throughout the United States.  Defendants' conduct had a direct,

substantial, and reasonably foreseeable effect on interstate commerce in the United States,

including in this District.

47.     Throughout the Class Period, Defendants also perpetrated their pattern of

racketeering activity through their use of the U.S. mail and interstate and international wires.

48.     This Court has personal jurisdiction over each Defendant because, *inter alia*:

(a) Defendants maintain their principal places of business in this District; (b) Defendants

transacted business throughout the United States, including in this District; (c) Defendants

participated in the selling and distribution of analog insulin drugs throughout the United States,

including in this District; (d) Defendants had and maintained substantial contacts with the United

States, including in this District; (e) Defendants were engaged in an unlawful conspiracy and

were members of unlawful enterprises designed to inflate the prices for analog insulin drugs; and (f) those conspiracies and enterprises were directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.  THE PARTIES

#### A.  Plaintiffs

49.     Plaintiff PDC is a corporation organized under the laws of the State of Mississippi, with its principal place of business located at 186 Bohn Street, Biloxi, Mississippi 39530.

50.     Plaintiff FWK is a limited liability company organized under the laws of the State of Illinois, with its principal place of business located in Glen Ellyn, Illinois.   FWK is the assignee of the claims of the Frank W. Kerr Co.

51.     During the Class Period, PDC purchased Lantus directly from Defendant Sanofi on February 10, 2009 and May 15, 2009 and purchased Levemir directly from Defendant Novo on June 16, 2010.

52.     Based on information currently available, during the Class Period, FWK purchased approximately $113,143,774.13 of Lantus directly from Defendant Sanofi, purchased approximately $25,455,136.10 of Levemir and $64,418,385.92 of NovoLog directly from Defendant Novo, and purchased approximately $45,419,536.95 of Humalog directly from Defendant Lilly.

53.     As a direct and proximate result of Defendants' unlawful conduct, including the racketeering activity Plaintiffs allege, Plaintiffs paid artificially inflated Distributor Prices for the NovoLog, Humalog, Lantus and Levemir that they purchased directly from Defendants.

### B. Defendants

54.     Defendant Novo is a Delaware corporation with its principal place of business located at 800 Scudders Mill Road, Plainsboro, New Jersey, 08536.  Novo is one of the largest producers of insulin drugs in the U.S.  During the Class Period, Novo manufactured and sold NovoLog and Levemir, among other insulin drugs, to purchasers in this District and throughout the United States.

55.     Defendant Lilly is an Indiana corporation with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana, 46285.  During the Class Period, Lilly manufactured and sold Humalog to purchasers in this District and throughout the United States.

56.     Defendant Sanofi is a Delaware limited liability corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  During the Class Period, Sanofi manufactured and sold Lantus to purchasers in this District and throughout the United States.

57.     Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs and acting within the scope of their employment.

### IV.  THE BASES OF CLASS MEMBERS' CLAIMS

### A. Prevalence of Diabetes in the U.S.

58.     Diabetes is an increasingly common disease in the U.S. that occurs in patients who have a lack of insulin production or an inability to respond to insulin.

59.     Insulin, which regulates metabolic processes in the body, is created by the pancreas.  Insulin enables cells in the body to absorb glucose from the blood.  Glucose serves as

energy for cells or is converted to fat for storage.  Insulin also regulates the breakdown of fat and protein.

60.     More than 30 million people in the U.S. have diabetes.[1]

61.     Type 1 diabetes is characterized by a lack of production of insulin to lower blood sugar, while Type 2 diabetes is characterized by insulin resistance.

62.     Diabetes is a leading cause of morbidity and mortality in the U.S.  In 2016, diabetes was the eighth-leading cause of death in New Jersey, and roughly 640,000 adults, or 9.2% of New Jersey's adult population, suffered from the disease.[2]

63.     The disease disproportionately impacts certain minority communities.  In 2016, diabetes was the fifth-leading cause of death among African-Americans, Latinos, and Asians living in New Jersey.  The disease was also the sixth-leading cause of death among males, and eighth among Caucasians and females.

64.     Type 1 diabetes, formerly known as juvenile diabetes or insulin-dependent diabetes, is more frequently diagnosed in children and young adults and occurs when a patient's pancreas does not produce sufficient insulin.  Type 1 diabetes is an autoimmune disease in which the immune system destroys the beta cells in the pancreas that make insulin.

65.     In the U.S., 90 to 95% of people with diabetes have Type 2.[3]  A non-diabetic with high blood sugar levels may develop Type 2 diabetes.  Type 2 diabetes, formerly known as adult-

---

[1] *See* https://www.cdc.gov/diabetes/basics/diabetes.html.

[2] *See* https://www.state.nj.us/health/chs/hnj2020/chronic/diabetes/.

[3] *See* https://www.cdc.gov/diabetes/basics/type2.html.

onset or noninsulin-dependent diabetes, is more common in adults and occurs when a patient's body becomes resistant to insulin or when the pancreas stops producing enough insulin.

66.     According to a study published in the Journal of the American Medical Association ("JAMA") in 2015, nearly 50% of adults in the U.S. have diabetes or pre-diabetes.[4]

67.     As of 2012, the annual cost in diabetes-related health expenditures and lost productivity in the U.S. totaled $245 billion.[5]

**B.  Development and Importance of Analog Insulin Medications**

68.     In 1922, Frederick Banting, a Canadian orthopedic surgeon, and his medical student assistant, Charles Best, removed active insulin from the pancreases of cows and pigs to develop a treatment for human patients with diabetes.  There were virtually no medications available for the treatment of diabetes prior to this time.

69.     This type of insulin treatment was known as "beef and pork insulin."  Beef and pork insulin was "short-acting."  It affected patient blood sugar levels for three to six hours.

70.     Banting and Best obtained U.S. patents and sold their patent rights to the University of Toronto, which entered an agreement with Eli Lilly and Co. ("Lilly") to scale up production.

71.     Lilly applied for U.S. patents, claiming improvements to the manufacturing process.

---

[4] *See* Menke, Casagrande, Geiss, Cowie, "Prevalence of and Trends in Diabetes Among Adults in the United States, 1988-2012," JAMA (Sept. 8, 2015), available at https://jamanetwork.com/journals/jama/fullarticle/2434682.

[5] *Id.*

72.     The University of Toronto also licensed the patent rights to produce insulin to Nordisk Insulin Laboratorium ("Nordisk") and Novo Terapeutisk Laboratorium ("Novo Terapeutisk") of Denmark, among other companies.

73.     In the early 1930s, Nordisk researchers discovered "long-acting" insulin by adding a certain protein to insulin, which altered its absorption into the bloodstream and prolonged its effect.

74.     In the 1940s, innovations in insulin delivery made it possible to combine long-acting and short-acting insulin, which resulted in a single daily injection for many diabetes patients.

75.     However, some patients had adverse reactions to beef and pork insulin because the composition is different from human insulin.  In particular, many patients' immune systems produced antibodies against beef and pork insulin, neutralizing its actions and causing inflammation at injection sites.

76.     The beef and pork insulin patents began to expire in the late 1970s.

77.     As the patents began expiring, researchers developed methods of producing human insulin through recombinant DNA technology.

78.     By 1982, Lilly brought this first "recombinant human insulin" to the U.S. market.

79.     Novo Terapeutisk then developed recombinant human insulin.  In 1989, Novo Terapeutisk and Nordisk merged to form defendant Novo.

80.     Lilly and Novo each obtained new insulin patents.

81.     In the mid-1990s, researchers developed improvements to the DNA sequence of human insulin, resulting in "analog insulin."  Analog insulin mimics the body's natural pattern of insulin release.

82.     Lilly obtained approval to market Humalog in the U.S. in 1996.  Humalog was the first rapid-acting analog insulin and had substantially faster absorption times.  Rapid-acting analog insulin enters the bloodstream within minutes.

83.     In 2001, Novo released a rapid-acting analog insulin product, NovoLog.

84.     Humalog and NovoLog are sold in the U.S. as solutions, suspensions, cartridges/penfills and pens.

85.     Sanofi released the first long-acting analog insulin, Lantus, in 2001.  Long-acting analog insulin provides relatively constant insulin levels that plateau for many hours after injection.  The active ingredient of Lantus is insulin glargine.

86.     Sanofi's U.S. patents on its long-acting analog insulins began expiring in June 2014.  Sanofi's patent claiming insulin glargine expired in August 2014, with pediatric exclusivity expiring in February 2015.

87.     Five years after Lantus's market debut, Novo's long-acting analog, Levemir, entered the market.  The patent for Levemir expired on June 16, 2019.

88.     Sanofi markets an insulin glargine injection product called Toujeo®.

89.     Sanofi did not have competition from another insulin glargine product until December 2016, when Lilly and Boehringer Ingelheim Pharmaceuticals, Inc.'s Basaglar® insulin glargine injection ("Basaglar") entered the market.

90.     Basaglar is a follow-on insulin for Lantus pens and is not a true generic.  Prices for Lantus and Levemir remained at supracompetitive levels after Basaglar's market entry.

### C.  Analog Insulin Dominates the U.S. Insulin Market

91.     Analog insulin dominates the insulin market in the U.S. today.

92.     Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas.  As a result, insulin analogs provide increased treatment options.

93.     The American Diabetes Association (the "ADA") publishes standards of medical care in diabetes.[6]  The ADA recommends insulin analogs for both Type 1 and Type 2 diabetes patients.

94.     Physicians uniformly prescribe analog insulins for Type 1 patients.  Analog insulin is considered the most convenient initial insulin regimen by the ADA for Type 2 diabetes patients, and physicians prefer to prescribe analog insulins for Type 2 patients.

95.     In 2010, 91.5% of adults who filled more than one prescription for insulin did so with insulin analogs, whereas only 18.9% of Type 2 adult patients filled a prescription for human insulin.

96.     Due to the advantages of insulin analogs, sales of human insulin products, such as Novolin and Humulin, have dropped drastically.

97.     IMS data[7] for 2016 show that the three top-selling insulins in the U.S. were analogs.  Sanofi's long-acting Lantus produced $8.87 billion in sales.  Novo's long-acting

---

[6] *See* "American Diabetes Association Standards of Medical Care in Diabetes – 2017", THE JOURNAL OF CLINICAL AND APPLIED RESEARCH AND EDUCATION, DIABETES CARE®, available at http://care.diabetesjournals.org/content/diacare/suppl/2016/12/15/40.Supplement_1.DC1/DC_40 _S1_final.pdf.

[7] IMS data is provided by IMS Health, Inc.  ("IMS Health") (n/k/a IQVIA).  IMS Health collects pricing data from retail pharmacies, including independents, chains, and pharmacies within food stores or mass merchandisers,

Levemir produced $1.82 billion in U.S. sales in 2016.  Other analog insulins also posted blockbuster sales.  During 2016, Novo's NovoLog produced $5.86 billion in sales, and Lilly's rapid-acting Humalog produced $5.88 billion in sales.

### D.  Defendants' Analog Insulin Brands Are Therapeutically Interchangeable

98.     The long-acting analog insulins Lantus and Levemir are very similar drugs with few differences that impact treatment.  While not classified as generics of each other, they are generally considered to be therapeutically interchangeable.

99.     Both Lantus and Levemir are available in vial and cartridge delivery forms and are suitable for once-daily administration.

100.     Likewise, the rapid-acting insulins NovoLog and Humalog appear to have identical effects in diabetes patients.  Thus, NovoLog and Humalog also are considered therapeutically interchangeable.

101.     Studies show that there is no meaningful difference in the effectiveness of Levemir versus Lantus, or Humalog versus NovoLog.  The FDA has stated that, in certain circumstances, one brand of rapid-acting insulin may be substituted for another brand of rapid-acting insulin and that one brand of long-acting insulin may be substituted for another brand of long-acting insulin.[8]

102.     Generally, diabetes patients can easily switch insulin brands.  In most states, a physician does not need to write a new prescription for a patient to switch insulin brands.

---

[8] *See* https://www.fda.gov/drugs/emergencypreparedness/ucm085213.htm.

### E.  The Participants in the Distribution and Sale of Pharmaceutical Products

103.    The critical players in the prescription drug industry include pharmaceutical companies, distributors, pharmacies, health benefit providers (such as institutional insurers, self-insured employers, and health and welfare plans), PBMs, and patient-consumers.

104.    **Pharmaceutical Companies**.  Pharmaceutical companies own the rights to manufacture and market drugs.  They typically own or contract with facilities that manufacture drugs and then sell their products to the distributor Class Members.  Pharmaceutical companies set the prices of their drugs.  Those prices are used to calculate payments made by distributors and consumers.

105.    **Distributors**.  After production, pharmaceutical companies send their drugs to FDA-registered drug distributors, like Plaintiffs and the Class Members, for further distribution. Distributors purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals and clinics.  Manufacturers establish the Distributor Prices at which Class Members purchase drugs from the manufacturers.

106.    Drug manufacturers typically send the distributor Class Members notifications regarding new Distributor Prices via the U.S. mail or interstate wires.

107.    During the Class Period, the Distributor Prices that distributors have paid for pharmaceuticals have been set by the pharmaceutical companies.  Plaintiffs had no power to negotiate the Distributor Prices they paid for Defendants' analog insulins.

108.    **Health benefit providers**.  Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans.  Health benefit providers submit payments on behalf of insured individuals to healthcare providers (doctors and medical facilities) for services rendered to the insured individuals.  Health insurers also cover a portion of their

beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members.  The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits.

109.    **Pharmacy Benefit Managers**.  PBMs effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers.  PBMs perform a variety of services on behalf of their health insurer clients, including negotiating prices with drug companies, creating formularies, managing prescription billing, constructing retail pharmacy networks for insurers, and providing mail-order services.

110.    PBMs generally are not a direct link in the physical supply chain for pharmaceutical products.  That is, in most instances, PBMs do not take possession or control of prescription drugs.

111.    Business is booming for the PBM Conspirators.  Together, they bring in more than $200 billion a year in revenue.  They also control over 80% of the PBM market, covering 180 million insured people.

112.    CVS provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million consumers.

113.    Express Scripts covers roughly 79 million consumers.

114.    OptumRx covers roughly 65 million consumers.

F.    **The Drug Payment and Distribution Structure**

115.    **Distribution**.  In retail pharmacy channels, branded prescription drugs are generally sold by manufacturer to distributor, distributor to retail pharmacy (or mail order), and retailer to patient.

116.   **Downstream charges**.  The downstream charges for prescription medications are from manufacturer to distributor, distributor to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of ingredient cost reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, and/or cash).

117.   **Upstream charges**.  The upstream charges are from health benefit providers and/or PBMs directly back to the manufacturer.  These upstream charges are price discounts Defendants and other pharmaceutical companies offer PBMs and their health insurer clients in the form of "rebates."  Those rebates are typically paid well after the point-of-sale transactions.

118.   Figure 1 below illustrates this payment structure.

119.   The figure labels certain payments "payment" and others "negotiated payment." The term "payment" refers to individual payments, made at the time of delivery, such as when a patient walks into a pharmacy and picks up her prescription.  At that moment, her health plan also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies.

120.   In contrast, a "negotiated payment" is a payment made under a negotiated contract.  For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time.  Figure 1 also indicates the flow of products and rebates.

**Figure 1: The U.S. Drug Payment Structure**



### G.      Benchmark Pricing as a Basis for Reimbursement

121.      When insured consumers buy medications from pharmacies (retailers), the consumers' insurers pay the pharmacies based on the prices their PBM negotiated for those medications (the net price).

122.      In addition, consumers usually pay a portion of their medications' cost. Importantly, patients' payments are typically based on the benchmark price the drug manufacturer sets for a given drug.

123.      The AWP or benchmark price of pharmaceuticals is an average price supposedly paid by retailers to buy a drug from the wholesaler.

124.      Typically, only the AWP or benchmark price of a pharmaceutical is publicly available.

125.    The AWP or benchmark price is not, however, a true representation of actual market prices for either generic or branded drug products.

126.    Rather, the benchmark price is typically inflated by roughly 20% above the Distributor Prices that manufacturers, like Defendants, maintain for sales of pharmaceuticals to distributors, like the Class Members.

127.    Nevertheless, payers have long used the AWP or benchmark price to determine how much third parties, such as the government and private payers, will pay for prescription drugs.

128.    AWP is not a government-regulated figure and does not include buyer volume discounts or the massive rebates that some manufacturers pay to PBMs to maintain favorable formulary positions for the manufacturers' medications.

129.    Rather, publishers of drug pricing data, such as Medi-Span and First Data Bank, sell data concerning AWPs reported by manufacturers to government entities, private insurance companies, and other payers for prescription drugs.  The purchasers of that data then use the reported AWP or benchmark prices to determine reimbursement and retail prices.

130.    Because AWP is a component of the formulas used to determine reimbursement, elevated AWP numbers can drastically increase the dollar amount that government entities, private insurance programs, and consumers with deductibles or coinsurance pay for prescription medications.

131.    The prescription drug industry is unusual in that there are stark differences in the way patients pay for products versus how health benefit providers pay for the same products.

132.    Defendants' benchmark prices impact the contributions that Defrauded Consumers make to the cost of their analog insulins in the form of coinsurance payments, cash payments made in the absence of insurance coverage, and deductible payments.

133.    First, in the case of coinsurance, consumers pay a pre-set percentage of the point-of-sale transaction price.  Second, in the case of cash transactions, consumers pay a usual and customary price.  And, third, in the case of deductibles, consumers pay a portion of the point-of-sale transaction price.  Consumers might also pay a tiered or fixed copay.

134.    Consumers make these payments at the point-of-sale only.  In contrast, intermediaries and third-party payers typically determine net costs for pharmaceuticals based on arrangements that apply to hundreds of products.  And these charges occur not only at the point-of-sale, but also during later, off-invoice transactions.

135.    Payers' reimbursement formulas will often include a series of price benchmarks and payment caps.  The price benchmarks used in payers' formulas are commonly adjusted by a percentage that is contractually set (for commercial payers) or established through regulatory procedures (for public payers).  For example, reimbursement could be determined based on the lower of the drug's (i) AWP – x%, (ii) Distributor Price + y%, and (iii) payment cap.

136.    Despite multiple modifications to health insurers' reimbursement policies over time, AWP remains the most commonly and continuously used set of reference prices in reimbursement and provider payment calculations and negotiations for retail channel drug transactions.

137.    During the Class Period, AWP was a basis of the payments made by Defrauded Consumers for their analog insulins.

H.      **The Victims of Defendants' Analog Insulins Price Inflation Scheme**

138.   **Distributors.**  When distributors like Plaintiffs and Class Members purchase drugs from manufacturers like Defendants, the price of those medications is set by the manufacturers.  Likewise, Defrauded Consumers did not negotiate the prices they paid for Defendants' analog insulins.

139.   The prices that Plaintiffs and Class Members paid for Defendants' analog insulins were the Distributor Prices that Defendants established, minus small discounts for early payment of invoices and similar incentives.

140.   **Defrauded Consumers.**  The prices pharmacies charged Defrauded Consumers for Defendants' analog insulins are based on the benchmark prices that Defendants publish.  For example, the retail price may equal the benchmark price less a small discount of roughly 15%.

141.   This benchmark price is not determined by the pharmacy or the distributor that sold the drug directly to the pharmacy.

142.   The pharmacy's use of the benchmark price is akin to a stockbroker's use of the market price of a stock in connection with a retail investor's purchase.  The pharmacy, like the broker, does not and cannot change or influence the benchmark price.  It can only report that price to the consumer.

143.   Three principal types of consumers pay for prescription medications based on the benchmark prices that drug manufacturers—and drug manufacturers alone—set: (1) uninsured consumers; (2) consumers in high-deductible plans; and (3) consumers with coinsurance obligations.  Out-of-pocket costs for insured consumers come in three forms: deductibles, coinsurance requirements, and/or copayment requirements.

144.    **Uninsured**.  Uninsured consumers must pay the full, point-of-sale prices (based on benchmark prices) every time they purchase a prescription medication.

145.    Despite the Affordable Care Act's ("ACA") expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5 million in 2015— remain without healthcare insurance coverage.

146.    This uninsured population is especially concentrated in states that did not adopt the ACA's Medicaid expansion, and diabetes is more prevalent in those jurisdictions.

147.    Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it.  The uninsured population may grow drastically in the next few years if cost-sharing reduction payments under the ACA are discontinued.

148.    **High-deductible Plans**.  The term "deductible" refers to a set amount of healthcare cost an insured individual must pay out-of-pocket before their plan begins to contribute to their healthcare costs.  High-deductible health plans are aptly named for their larger-than-average deductibles.

149.    While high-deductible health plans usually boast lower premiums, they are nonetheless more onerous to patients and families that need expensive care on a regular basis. Insured individuals in high-deductible plans are usually required to pay full, point-of-sale prices (based on benchmark prices) before they reach their deductibles.

150.    Over time, as the cost of healthcare and medical insurance have significantly outpaced inflation, high-deductible plans have become more prevalent.

151.    In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high-deductible health plans, up from 17% in 2011.

152.    Although Preferred Provider Organizations (PPOs) are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs fell 10% between 2014 and 2016, while enrollment in high-deductible health plans has increased by 8%.  Figure 2, which was created by the Kaiser Family Foundation, illustrates the rising trend in high-deductible plans.

**Figure 2: Percentage of covered workers enrolled
in high-deductible health plans from 2006-2016**




*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE:  Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

153.    Moreover, deductibles themselves have risen.  The average annual deductible for an individual enrolled in a high-deductible plan was between $2,031 and $2,295 in 2016, depending on the exact type of plan.  The average annual deductible for family coverage was between $4,321 and $4,364 in 2016, again, depending on the type of plan.

154.    A recent Kaiser Family Foundation study found that 30% to 40% of U.S. households with private coverage do not have enough liquid assets to pay the deductible required by their health plan.  Figure 3 below illustrates this unfortunate reality.

**Figure 3: Share of non-elderly households with liquid assets less than their deductibles among people with private health insurance**



155.    Overall, in the entire employer-based health plan marketplace, deductibles rose 12% between 2015 and 2016—four times faster than premiums increased in the same period. Among all individuals enrolled in employer health plans (both high-deductible plans and others), the average deductible in 2016 was $1,478.

156.    Figure 4 shows the increase in health plans with a general annual deductible of $1,000 or more, broken down by firm size.

**Figure 4: Percentage of covered workers enrolled in a plan with a general annual deductible of $1000 or more for single coverage, by firm size, from 2006-2016**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



157.    The average deductibles for plans available under the ACA on the Marketplace Exchanges are also high.

158.    The Marketplace health plans are broken into "metal" tiers: bronze, silver, gold, and platinum.  The cheapest plans—bronze and silver—unsurprisingly feature the highest deductibles.  In 2016, the average deductible in bronze plans was $5,765 (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

159.    High-deductible plans are particularly hard on patients with chronic diseases, like diabetes.  Those patients generally hit their deductibles year after year.  Moreover, they pay off those deductibles over a shorter period at the beginning of insured years.

160.    That dynamic produces a significant financial burden on Defrauded Consumers suffering from diabetes at the start of each year.

161.   **Coinsurance and Copayments**.  In addition to their deductibles, individuals with medical insurance typically make copayments or coinsurance payments for healthcare services.

162.   A copayment is a fixed or tiered fee that insured consumers must pay for healthcare services at the time of care, such as when they pick up prescriptions.  Copayment rates vary depending on the drug.  Usually drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

163.   Coinsurance functions much like copayments.  Instead of paying a fixed or tiered fee for a particular service, however, individuals with coinsurance arrangements pay a fixed percentage of the cost of the healthcare service provided.

164.   For drugs, this means a percentage of the plan's point-of-sale price, which is mathematically tied to the drug's benchmark price.  This percentage can vary, with lower coinsurance rates for preferred drugs and higher coinsurance rates for disfavored drugs.

165.   For insured individuals in high-deductible health plans, copayments and coinsurance obligations begin after they reach their deductibles.  Plans that cover prescription drugs without requiring patients to reach deductibles first usually require copayments or coinsurance contributions for every drug purchase.

166.   For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates in 2016 were 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs, which are typically extremely expensive specialty medications for diseases such as cancer.

167.   Humalog, Levemir, NovoLog, and Lantus are still branded drugs.

168.    Insurance plans therefore generally classify them as second-tier or third-tier drugs on their formularies.  As a result, coinsurance payments keyed to the benchmark prices of these medicines can be quite burdensome.

169.    In recent years, health plans have been demanding higher coinsurance contributions from patients.  Table 1 shows this trend.

## Table 1: Rising Coinsurance Rates

| Retail Coinsurance Payment | | | |
|---|---|---|---|
| | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

170.    Overall, out-of-pocket spending for prescription drugs has shifted away from copayments toward deductibles and coinsurance spending over the past decade.  In 2014,

patients paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to just 4% in 2004.  Similarly, patients paid for 20% of their out-of-pocket drug expenses through coinsurance in 2014, compared to just 3% in 2004.

171.     **Medicare Part D**.  Patients in Medicare Part D plans—Medicare's prescription drug program—also often pay a large portion of their drugs' benchmark prices.

172.     In 2017, the Medicare Part D standard prescription drug plan had a $400 deductible and a 25% coinsurance obligation up to an initial coverage limit of $3,700.

173.     This meant patients in Medicare Part D plans paid full, point-of-sale prices (based on benchmark prices) until they spent $400.

174.     After they hit the $400 deductible, they paid 25% of their drugs' point-of-sale prices (based on benchmark prices) until they, together with their plans, spent $3,700 on drugs.

175.     Once Part D patients met this $3,700 coverage limit, they fell into the Coverage Gap, more commonly known as the "Donut Hole."  In the Donut Hole, they are required to pay 40% of their brand-name drugs' point-of-sale prices.

176.     Only after patients' total out-of-pocket spending (both before and in the Donut Hole) reached $4,950 did their Medicare Part D plans begin to shoulder 95% of the patients' prescription drug costs again.

177.     Figure 5 demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.

**Figure 5: The standard Medicare prescription drug benefit in 2017**





NOTE: Some amounts rounded to nearest dollar. ¹Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.

### I.   The Inflated Prices that Class Members and Defrauded Consumers Have Paid for Analog Insulins

178.   Defendants have utilized their Price Inflation Scheme to impose ever-escalating prices for analog insulins upon Plaintiffs, Class Members, and Defrauded Consumers.

179.   In the case of Plaintiffs and the Class Members, those higher prices equaled Defendants' artificially inflated Distributor Prices.  Defendants established and published the inflated Distributor Prices to generate the excess income necessary to pay the PBM Conspirators the kickbacks required to maintain favorable formulary positions for Defendants' analog insulins.

180.   Defrauded Consumers with insurance also pay drastically higher prices for analog insulins than their insurers.

181.   Likewise, uninsured patients must pay full, point-of-sale prices based on benchmark prices.

182.   Patients who must pay the full cost of their drugs' costs before those consumers hit their deductibles must also pay full, point-of-sale prices based on benchmark prices until they meet the deductible.

183.   Patients with coinsurance obligations pay for a percentage of their drugs' point-of-sale prices, again based on benchmark prices.

184.   Similarly, patients with Medicare Part D plans pay based on benchmark prices before they meet their deductibles, and then pay between 25% and 40% of point-of-sale prices based on benchmark prices until they exceed $4,950 in personal spending on health care in a given year.

185.   An example helps illustrate this structure.  A woman with diabetes needs to purchase a box of one of the Defendants' insulin pens.  She goes to her local retail pharmacy, where the pharmacist tells her the box's benchmark price is $450.  She has health insurance through her employer.  Her plan requires her to pay a $2,000 deductible and then 30% coinsurance after she hits her deductible.  If she has not yet reached her deductible, she pays $382.50 (benchmark price (AWP) minus 15%, *i.e.*, the point-of-sale price) for the box of insulin. If she has reached her deductible (*i.e.,* she has already paid $2,000 in health care costs), she pays $114.75 (382.50 x .3) for the box.

186.   In that example, the consumer reasonably believes her insurer paid the remaining $267.75 for her insulin, but that is not the case.

187.   In fact, in a transaction concealed from the patient, the Defendant that manufactured the consumer's insulin pays an undisclosed amount of money back to a PBM, most likely one of the PBM Conspirators.

188.   The PBM then pays a portion of this "rebate" to its insurer client.  Thus, the net price of this insulin to the consumer's insurer is much lower than the price utilized to determine her contribution to the purchase price.

189.   In the case of analog insulins, the publicly reported benchmark numbers that Defendants use to set prices for consumer transactions have climbed further and further away from the net prices that institutional payers pay.  The net prices of analog insulins to the PBM Conspirators and insurers are much lower than Defendants' published benchmark prices.  In many instances, the actual net prices of analog insulins are 35-50% lower than published benchmark prices.

190.   Taking the above example one step further: the Defendant's publicly reported benchmark price is $450, but its secret net price to one of the PBM Conspirators is $229.50 (AWP minus 15%, less a 40% "rebate").

191.   As a result, when the consumer paid $382.50 for the box before she reaches her deductible, she really paid 166% of the net price ($382.50 divided by $229.50).

192.   And when that consumer paid $114.75 for her 30% coinsurance, she really paid 50% coinsurance ($114.75 divided by $229.50).

193.   A 2014 study found that, among patients with commercial insurance, out-of-pocket costs for people with type 2 diabetes rose a staggering 89% from 2000 to 2010.

194.   Moreover, patients with endocrine disorders, such as diabetes, are more likely to shoulder out-of-pocket costs in excess of $1,000 per year than patients in any other disease class.

As Figure 6 illustrates, 70% of people with endocrine disorders have out-of-pocket drug spending at or above $1,000 per year.

**Figure 6: Conditions that are more likely to lead to high out-of-pocket spending**



Source: Kaiser Family Foundation analysis of Truven Health Analytics MarketScan Commercial Claims and Encounters Database, 2004-2014

**Peterson-Kaiser Health System Tracker**

195.    The increasing number of patients with high-deductible plans and coinsurance obligations, together with the rise in coinsurance rates, have made the pain associated with Defendants' Price Inflation Scheme particularly acute for Defrauded Consumers.

**J.    Defendants Employed Their Massive Benchmark Price Increases to Increase Spreads for the PBM Conspirators in Exchange for Preferred Formulary Status**

196.    Although drug companies usually rely on their research and development costs or purported improvements in the "clinical benefits" of their drugs to rationalize high pharmaceutical prices, Defendants' analog insulin price hikes are unrelated to those factors.

197.    In fact, the clinical benefits of these medications have not changed for many years.  For example, Levemir and NovoLog are the exact same drugs they were 10 years ago, but Defendants continue to increase the Distributor Prices and benchmark prices of those drugs dramatically every year.

198.    The actual cause of the rapidly escalating Distributor Prices and benchmark prices is Defendants' Price Inflation Scheme.

199.    To implement that scheme, Defendants set two different prices for their insulin treatments: the publicly reported benchmark price and the significantly lower, real price that they offer to the PBM Conspirators.

200.    Both the PBM Conspirators and drug companies refuse to disclose these lower, real prices, labeling them trade secrets.  The public-facing, pretextual, and false justification for such secrecy is that Defendants and the PBM Conspirators purportedly do not want their competitors to know the extent of their discounts.

201.    In truth, Defendants' Price Inflation Scheme explains Defendants' concealment of their actual prices.

202.    The Price Inflation Scheme benefits both Defendants and the PBM Conspirators because the PBMs turn a profit in two primary ways in connection with their management of prescriptions for Defendants' analog insulins.

203. First, the PBM Conspirators' health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies.

204. Second, the PBM Conspirators pocket a percentage of the spread between the reported benchmark price of Defendants' analog insulins and the undisclosed real price they secure, with the rest passed on to the PBM Conspirators' health insurer clients. The steep rebates that Defendants pay to the PBM Conspirators pursuant to the Price Inflation Scheme equal as much as 25% or more of the benchmark price.

205. Defendants' "rebate" arrangements with the PBM Conspirators are purportedly intended to create an incentive for the PBM Conspirators to negotiate lower real drug prices.

206. In reality, the "discounts" the PBM Conspirators supposedly obtain from Defendants are simply reductions off artificially inflated benchmark prices. In other words, these "discounts" are not discounts at all.

207. Nevertheless, Defendants know that they can manipulate the spreads between the benchmark and real prices of analog insulins to eliminate the PBM Conspirators' incentive to control actual costs.

208. Because Defendants recognize that the PBM Conspirators benefit from increased analog insulin spreads, Defendants consistently raise the benchmark prices of those drugs.

209. That tactic allows Defendants to compete by paying hidden rebates to the PBM Conspirators, rather than based on the prices of their interchangeable analog insulins.

210. When Defendants employ that tactic, the Defendant with the largest spread between benchmark and real price is more likely to secure preferred formulary positions from the PBM Conspirators and, as a result, the business of the PBM Conspirators' clients. In other

words, instead of marketing lower *real* prices to the PBM Conspirators, Defendants market the spread *between* the benchmark and actual retail prices.

211.    The inflated benchmark price increases do not cost the PBM Conspirators anything, so long as real prices remain constant.  The PBM Conspirators always pay the real price, not the inflated Distributor Prices or benchmark prices Defendants publish.

212.    By forcing Plaintiffs and Class Members to pay the artificially inflated Distributor Prices for the analog insulins they purchase, Defendants recoup the kickbacks they pay the PBM Conspirators.

213.    As a result, large spreads damage not only Defrauded Consumers, they injure the distributors of Defendants' pharmaceuticals.  In effect, Class Members fund kickbacks paid by Defendants to the PBM Conspirators by paying inflated prices—the Distributor Prices—to Defendants for products like analog insulins.

214.    In contrast, Defendants reap substantial financial benefits from the Price Inflation Scheme.

215.    PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, *i.e.*, when a drug "goes generic."

216.    But PBMs also possess significant leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy and risk profiles, as is true of analog insulins.

217.    Based in part on the prices they secure, the PBM Conspirators set up tiered formularies for their clients, who are principally health insurance companies.

218.    Formularies are ranked lists of drugs, where cheaper and more effective medicines are generally placed into lower tiers.  The health insurers rely on these formularies to determine how much of their members' drug costs they will cover.  Drugs in lower, preferred formulary tiers are cheaper for plan members.

219.    As a result, the PBM Conspirators' formularies enabled them to push patients toward certain brands of drugs over others, giving them enormous control over drug purchasing behavior.

220.    Where two or more drug manufacturers make largely interchangeable products, those companies would, in a truly competitive market, compete for formulary access by continually lowering their real prices.

221.    The Price Inflation Scheme allows Defendants to avoid pressure from the PBM Conspirators to lower the actual prices of analog insulins.

222.    As a quid pro quo for enhancing the PBM Conspirators' finances through the Price Inflation Scheme, the PBM Conspirators provide Defendants' analog insulins with favorable formulary placements and an actual net selling price equal to what it would be in the absence of Defendants' scheme.

223.    Indeed, according to a study published in JAMA on April 5, 2016, the mean price per milliliter of insulin for diabetes patients increased by 197% between 2002 and 2013, from $4.34 per milliliter to $12.92 per milliliter.[9]

---

[9] *See* Xinyang Hua, Natalie Carvalho, Michelle Tew, "Expenditures and Prices of Antihyperglycemic Medications in the United States: 2002-2013," JAMA (Apr. 5, 2016), available at http://jamanetwork.com/journals/jama/fullarticle/2510902.

224.    As a result of Defendants' fraudulent Price Inflation Scheme, Plaintiffs and Class Members experienced similar price increases in Defendants' Distributor Prices for analog insulins during that time period.

225.    No rational economic explanation exists for Defendants' continual increases in the benchmark prices of analog insulin products.  In particular, neither the cost nor availability of raw materials nor any increase in manufacturing costs explains those continual cost increases.

226.    Likewise, drug shortage reports for the relevant time period do not list the active ingredients in Defendants' analog insulin products as being in short supply: (1) NovoLog (insulin aspart); (2) Humalog (insulin lispro); (3) Levemir (insulin detemir); and (4) Lantus (insulin glargine).[10]

227.    Rather, because there are no generic versions of Lantus, Levemir, NovoLog or Humalog on the market, Defendants are exploiting their market dominance to enhance their profits at the expense of Class Members and Defrauded Consumers by: (a) paying kickbacks to the PBM Conspirators to retain Defendants' positions on the PBMs' formularies; and (b) recouping the cost of those kickbacks from Plaintiffs and Class Members.

228.    Although Defendants claim they "need" to inflate their benchmark prices to obtain formulary status, this explanation is false.  Drug companies could compete for formulary status in a manner that would help Class Members and consumers, *i.e.,* by lowering the Distributor Prices and net selling prices of their analog insulins.  In the absence of the kickback arrangement, Defendants would compete based on price, and the Distributor Prices paid by Class Members would be lower.

---

[10] *See* FDA Drug Shortages website, https://www.accessdata.fda.gov/scripts/drugshortages/; American Society of Health-System Pharmacists, http://www.ashp.org/shortages.

**K.   Defendants Have Consistently and Dramatically Increased the Distributor Prices and Benchmark Prices of Analog Insulins to the Detriment of Plaintiffs, Class Members, and Defrauded Consumers**

229.   Insidiously, Defendants have engaged in an arms race of escalating Distributor Prices and reported benchmark prices—and consequently spreads.  Each Defendant raises its benchmark price just slightly more than its competitors, which encourages the PBM Conspirators to keep the drug with the highest benchmark price on the PBM's formulary.

230.   A recent report described the perverse, reverse incentives for larger benchmark prices (and consequent consumer and Class Member overpayments) as follows:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher benchmark price increases than would otherwise occur, particularly on the eve of a general election.  Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors.  When brand manufacturers' [benchmark price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors.  Thus all else equal in a given category, the product with the more rapid benchmark price increases is more profitable to the PBM.  Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of benchmark price inflation at least as high, and ideally just a bit higher, than peers'.  Durable benchmark price inflation is the natural result.  Net price inflation is unaffected, but unit volumes suffer as higher benchmark prices directly impact consumers who have not yet met their deductibles.[11]

231.   Defendants have also admitted that they manipulate benchmark prices to obtain favorable formulary positions for their analog insulins.

232.   In a November 30, 2016 press release, Novo explained its rapidly escalating benchmark prices by admitting that it set those prices with an eye towards the spread:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . . News

---

[11] *See* Richard Evans, Scott Hinds, & Ryan Baum, "US Rx Net Pricing Trends Thru 2Q16," SSR LLC, 36 (Oct. 5, 2016).

reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "[benchmark] price" increases we've made over the last decade.  In other words, a [benchmark] price increase by XX percent leads to an automatic XX percent profit for the drug maker.  We believe that is misleading and here's why: As the manufacturer, we do set the "[benchmark] price" and have full accountability for those increases.  However, after we set the [benchmark] price, we negotiate with the companies that actually pay for the medicines, which we call payers.  This is necessary in order for our medicines to stay on their preferred drug list or formulary.  The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price."  The net price more closely reflects our actual profits.

233.     Lilly also admitted that it raises benchmark prices as a quid pro quo for formulary positions.

234.     An October 7, 2016 *Wall Street Journal* article credited Enrique Conterno, President of Lilly's diabetes business, with observing that the "reason drugmakers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."

235.     Sanofi made a similar admission.  Sanofi's Annual Report on SEC Form 20-F for 2016 states, "[S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US."

236.     Analyzing Defendants' price increases demonstrates the scope of the Price Inflation Scheme's impact.

237.     By the end of 2017, Lilly had raised the benchmark prices of Humalog to $663.00 for a package of pens and $343.38 for a box of cartridges.  Most diabetes patients need at least one package of insulin per month.  Figure 7 demonstrates Lilly's price increases from 2006 to 2019 for Humalog.

**Figure 7: Rising benchmark prices of Humalog vials and pens from 2006-2019**



238.    Novo's benchmark prices (AWP) for Levemir were $504.38 for a package of pens at the end of 2017 and $367.19 for a vial at the end of 2018.  Most diabetes patients need at least one package of insulin per month.  Novo's benchmark prices for NovoLog sat at $698.54 for a package of pens and $361.70 for a vial at the end of 2018.

239.    Figures 8 and 9 demonstrates Novo's price increases from 2006 to 2019 for Levemir and NovoLog.

**Figure 8: Rising benchmark prices of Levemir vials and pens from 2006-2019**



**Figure 9: Rising benchmark prices of NovoLog vials and pens from 2006-2019**



240.    At the end of 2018, Sanofi's benchmark prices for Lantus, the top-selling analog insulin, was $505.36 for a package of pens and $336.93 for a vial.

241.    Figure 10 demonstrates Sanofi's price increases from 2006 to 2019 for Lantus vial and pen packages.

**Figure 10: Rising benchmark prices of Lantus vials and pens from 2006-2019.**



242.     In just five years, Sanofi and Novo raised the reported prices for Lantus and Levemir by 168% and 169%, respectively.

243.     In 2016, Novo and Sanofi were responsible for the highest drug benchmark price increases in the pharmaceutical industry.  This distinction largely reflected their price hikes for Lantus and Levemir.

244.     Figure 11 shows the dramatic analog insulin benchmark price hikes imposed by Lilly, Novo, and Sanofi from 2000 to 2015.

**Figure 11: Rising insulin benchmark prices from 2000-2015**



245.    The absence of competition among the analog insulin manufacturers is illustrated by the fact that Lilly, Novo, and Sanofi have not only dramatically increased their products' benchmark prices in the last 10 years, but also levied those increases in perfect lock-step.

246.    In thirteen instances since 2009, Sanofi and Novo raised the benchmark prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."  Robert Langreth, "Hot Drugs Show Sharp Price Hikes in Shadow Market," Bloomberg (May 6, 2015).

247.    As the same report states, "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."

248.    Lilly, Novo, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Humalog, NovoLog, and Apidra, respectively.

249.    Figure 12 demonstrates this seemingly collusive behavior with respect to Lantus and Levemir.  Figure 13 demonstrates this collusive pattern of price hikes with respect to NovoLog and Humalog.

**Figure 12: Rising Lantus and Levemir benchmark prices from 2001-2015**



**Figure 13: Rising Humalog and NovoLog benchmark prices from 1996-2016**



250.     National Drug Acquisition Cost ("NADAC") data confirms that NovoLog and

Humalog prices and Lantus and Levemir prices have moved in lockstep since 2012.  NADAC

data is compiled by the Centers for Medicare and Medicaid Services and is based on a survey of

retail community pharmacy prices.

251.     According to the NADAC data, between 2012 and 2017, NovoLog prices

increased 104%, Humalog prices increased 107%, Lantus prices increased 101%, and Levemir

prices increased 121%.  The following chart (Figure 14) demonstrates the lockstep per milliliter

price increases shown in NADAC data for NovoLog and Humalog 100 unit/ML vials between

2012 and 2017.

**Figure 14: Lockstep Price Increases for NovoLog and Humalog 2012-2017**



252.     Figure 15 demonstrates the lockstep per milliliter price increases shown in NADAC

data for Lantus and Levemir 100 unit/ML vials between 2012 and 2017.

**Figure 15: Lockstep Price Increases for Lantus and Levemir 2012-2017**



253.    IMS Health data confirms that, between 2009 and 2017, NovoLog and Humalog, and Lantus and Levemir followed the same pattern of lockstep price increases.  During that period, NovoLog prices increased 207.21%, Humalog prices increased 206.6%, Lantus prices increased 184.33%, and Levemir prices increased 203.78%.

254.    The following chart (Figure 16) demonstrates the lockstep price increases per milliliter shown in IMS Health data for NovoLog and Humalog 100 unit/ML vials from January 2009 through June 2017.

**Figure 16: Lockstep Price Increases for NovoLog and Humalog Jan. 2009 – June 2017**



255.    Figure 17 demonstrates the lockstep per milliliter price increases shown in IMS

Health data[12] for Lantus and Levemir 100 unit/ML vials from January 2009 through June 2017.

---

[12] The IMS Health data graphed here is the total amount of the sales for chain stores by month reported by IMS divided by the extended unit sales in that same month reported by IMS. Extended units are the number of tablets, capsules, milliliters, ounces, etc. of a product shipped in each unit.  Extended units are calculated by multiplying the number of units by the product size.

**Figure 17: Lockstep Price Increases for Lantus and Levemir Jan. 2009 – June 2017**



256.    Like the retail prices of Defendants' analog insulins, the Distributor Prices for those medications have moved in lockstep as Defendants continually increased prices throughout the Class Period.

257.    Figure 18 demonstrates the lockstep Distributor Price increases shown in IMS Health data for NovoLog and Humalog 100 unit/ML vials between July 2011 and May 2017. That pricing data bears a striking resemblance to the inflated prices at the retail level.

**Figure 18: Lockstep Price Increases for NovoLog and Humalog Jul. 2011 – May 2017**



258.    The Distributor Prices of Lantus and Levemir have likewise moved in lockstep. The following chart demonstrates the lockstep Distributor Price increases shown in IMS Health data for Lantus and Levemir 100 unit/ML vials between July 2011 and May 2017.  This pricing data bears a striking resemblance to the increases paid at the retail level.

**Figure 19: Lockstep Price Increases for Lantus and Levemir Jul. 2011 – May 2017**



259.    Pursuant to Defendants' Price Inflation Scheme, they have implemented those rapid, lockstep analog insulin price increases without impacting the real prices paid by the PBM Conspirators and their insurer clients.  Rather, the ever-escalating benchmark prices are designed to maintain Defendants' favorable positions on the PBM Conspirators' formularies.

260.    For example, Novo has steeply raised the benchmark prices of Levemir and NovoLog for over a decade, while keeping the net prices of these drugs constant.  Figures 20 and 21, which were attached to Novo's November 30, 2016 press release, illustrate this conduct.

**Figure 20: Real Versus Benchmark Prices of NovoLog Vials**



**Figure 21: Real Versus Benchmark Prices of NovoLog FlexPens**



261.    Figure 22 illustrates Sanofi's manipulation of the Lantus spread.

**Figure 22: Real versus Benchmark Price of Lantus**



262.    Defendants' manipulation of their analog insulins spreads to curry favor with the PBM Conspirators is also evidenced by data concerning the amount of Defendants' "rebates" to PBMs and insurers.

263.    Figure 23 shows the amount Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 23: Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



Source: Company data, Credit Suisse estimates

264.    The spreads on Novo's analog insulins have exhibited the same pattern.  Figure 24 shows the increase in Novo's rebates (spreads) from 2007 to 2014.

**Figure 24: Novo's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



Source: Company data, Credit Suisse estimates

265.    Sanofi's spreads have also exhibited the same pattern.  Figure 25 shows the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 25: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



Source: Company data, Credit Suisse estimates

266.     The spreads that Sanofi and Novo employ with respect to their analog insulin medications have made those Defendants the second- and third-largest rebators in the pharmaceutical industry.

## L.     The Injuries that Defendants' Fraudulent Pricing Scheme Caused

267.     During the Class Period, Defendants deliberately and intentionally published Distributor Prices and benchmark prices for their analog insulins that did not reflect the actual market prices of those drugs.  As Defendants' Distributor Prices and benchmark prices soared further and further away from their net prices, the published Distributor Prices and benchmark prices were so untethered from Defendants' true average prices that the Distributor Prices and benchmark prices were fraudulent.

268.    Defendants published the inflated Distributor Prices and benchmark prices to create net-to-benchmark price spreads that Defendants marketed to PBM Conspirators in exchange for favorable formulary placements for Defendants' analog insulins.

269.    Thus, instead of competing based on the prices offered to Plaintiffs, Class Members, and Defrauded Consumers, Defendants employed the Price Inflation Scheme to offer something of value to the PBM Conspirators (large spreads on which to make profits) in exchange for preferred formulary status.

270.    That ruse cost Defendants nothing, while increasing the prices paid by Plaintiffs, Class Members, and the Defrauded Consumers, and enhancing the PBM Conspirators' profits.

271.    Defendants' Price Inflation Scheme injured Plaintiffs and Class Members because Defendants utilized the excessive payments they received from Class Members to finance the rebates Defendants paid to the PBM Conspirators to maintain favorable formulary status for Defendants' medications.

272.    The excessive Distributor Prices that Defendants' Price Inflation Scheme produced injured Plaintiffs and Class Members in two respects.

273.    First, they paid higher Distributor Prices to Defendants.

274.    Second, the demand for analog insulin products fell because Defrauded Consumers could not afford to pay the retail prices set for their analog insulins with reference to Defendants' fraudulently inflated benchmark prices.

275.    If Defendants did not inflate their Distributor Prices and benchmark prices and pay the rebates to the PBM Conspirators, the Distributor Prices paid by Plaintiffs and Class Members would have been considerably lower.

276.    Although Defendants' false benchmark prices also deceived and injured the Defrauded Consumers, Plaintiffs and the members of the Classes are direct purchasers of the Defendants' analog insulins.  As a result, they were the most directly harmed victims of Defendants' Price Inflation Scheme.

277.    The Defrauded Consumers had no reason to believe that: (a) Defendants' benchmark prices varied greatly from the prices the PBM Conspirators and insurers received; and (b) the prices for consumers were trending in an entirely different direction from the prices that the PBM Conspirators and insurers paid.

278.    Indeed, Defendants intentionally concealed their analog insulins' net prices and prevented Plaintiffs, Class Members, and the Defrauded Consumers from learning the net prices to ensure that the PBM Conspirators would benefit from the spreads between the net and benchmark prices.

279.    Defendants' intentional concealment of the Price Inflation Scheme was critical to its success.

280.    If the Defrauded Consumers did not believe—based on Defendants' fraudulent misrepresentations—that the published benchmark prices provided a reasonable basis for the consumers' cost-sharing obligations, the PBM Conspirators and health insurers could not have used the inflated benchmark prices as a basis for consumer cost-sharing.

281.    Moreover, if the PBM Conspirators could not use the artificial benchmark prices that Defendants published as a basis for reimbursement, the spreads between benchmark and net prices would evaporate, and the Distributor Price paid by Plaintiffs and Class Members would decrease substantially.

282.     Without spreads to sell, Defendants would have to compete for preferred formulary positions by offering lower prices to Plaintiffs, Class Members, the PBM Conspirators, and Defrauded Consumers.

283.     Due to Defendants' success in concealing their Price Inflation Scheme, however, Defrauded Consumers relied on Defendants' representations regarding their benchmark prices when the consumers paid for their analog insulins based on the fraudulent benchmark prices.

284.     Unaware of the true facts concerning the pricing of the analog insulins, Defrauded Consumers continue to pay for Defendants' analog insulins based on their benchmark prices, the only price truly available to consumers.

285.     The Price Inflation Scheme has also exacted a significant physical and psychological toll on Defrauded Consumers.

286.     People who suffer from diabetes are disproportionately poor.  As a result, many Defrauded Consumers have had to reduce the amount of analog insulins they utilize because they cannot afford that medication.

287.     To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day.

288.     These practices—which ineffectively control blood sugar levels—lead to serious complications such as kidney disease and kidney failure, heart disease and heart attacks, infection, amputation, blindness, sustained hyperglycemia, and, in severe cases, diabetic ketoacidosis—a life-threatening condition.

289.     Other Defrauded Consumers must resort to re-using needles and pen tips to cut back on their diabetes-related costs.  This practice exposes patients to a high risk of infection.

290.     Other Defrauded Consumers attempt to lower their diabetes-related costs by skipping the glucose testing they should conduct before injecting insulin.  Foregoing glucose testing can lead to under- or over-dosing insulin.

291.     Individuals living with diabetes spend, on average, twice as much on healthcare every year as those without the disease although an effective treatment for the disease has existed for more than 100 years.

292.     Diagnosed diabetes now costs the U.S. over $245 billion per year, which is roughly 20% of healthcare spending in the U.S.

293.     Defendants' Price Inflation Scheme has pushed, and will continue to push, access to life-saving drugs out of reach for countless uninsured and underinsured American diabetes patients.

**M.     Government Investigations of Insulin Pricing**

294.     On November 3, 2016, Senator Bernie Sanders and Representative Elijah E. Cummings sent correspondence to U.S. Attorney General Loretta Lynch and the Chair of the Federal Trade Commission ("FTC"), Edith Ramirez, requesting that the U.S. Department of Justice ("DOJ") and the FTC "investigate whether pharmaceutical companies manufacturing insulin products have colluded or engaged in anticompetitive behavior in setting their drug prices."[13]

295.     The Congressmen noted that, although the original insulin patent expired 75 years ago, drug prices were not falling.  Rather, the three Defendants were continuously increasing

---

[13] *See* Letter from Senator Sanders and Representative Cummings to U.S. Attorney General Loretta Lynch and FTC Chair Edith Ramirez, November 3, 2016, available at https://www.sanders.senate.gov/download/sanders-cummings-letter-to-doj-ftc-on-insulin?inline=file.

prices.  The letter further emphasized that, "[i]n numerous instances price increases have reportedly mirrored one another precisely."[14]

296.    According to the Congressmen's letter, "[t]he price of insulin more than tripled between 2002 and 2013 – from $231 to $736 per year per patient.  From 2010 to 2014, Lantus, made by Sanofi, increased in price by 168 percent; Humalog, made by Eli Lilly, increased by 103 percent."[15]

297.    The Congressmen noted the following specific, lockstep price increases reported by Bloomberg in 2015:

> On May 30 last year, the price for a vial of the blockbuster diabetes medication Lantus went up by 16.1 percent.  On the next day, Lantus's direct competitor, Levemir, also registered a price increase—of 16.1 percent.
>
> The pattern repeated itself six months later when Lantus, from French drugmaker Sanofi, was marked up 11.9 percent, and Levemir, made by Novo Nordisk A/S, matched again exactly.
>
> **In 13 instances since 2009, prices of Lantus and Levemir**—which dominate the global market for long-acting injectable insulin with $11 billion in combined sales—**have gone up in tandem in the U.S.,** according to SSR Health, a market researcher in Montclair, New Jersey.[16]

---

[14] *Id*. (citing Carolyn Johnson, "Why treating diabetes keeps getting more expensive," WASHINGTON POST (Oct. 31, 2016) and Robert Langreth, "Hot Drugs Show Sharp Price Hikes in Shadow Market," BLOOMBERG (May 6, 2015)).

[15] *Id*. (internal footnotes omitted).

[16] *Id*. (quoting Robert Langreth, "Hot Drugs Show Sharp Price Hikes in Shadow Market," BLOOMBERG (May 6, 2015)) (emphasis in original).

298.    On May 1, 2017, Lilly announced in a Securities and Exchange Commission filing that it had received civil investigative demands in connection with insulin pricing investigations by the attorneys general for the states of Washington and New Mexico.[17]

299.    Congressional investigations remain ongoing.  Moreover, the state of Colorado capped insulin co-payments.

300.    In a belated, ineffective effort to control the public relations fiasco, Lilly announced a half-price alternative to its top-selling Humalog product.[18]

## V.    FRAUDULENT CONCEALMENT AND TOLLING

301.    Because of Defendants' active concealment of their fraudulent conduct, Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein or of facts sufficient to place them on inquiry notice of the claims set forth herein, until at least November of 2016.

302.    During the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and Class Members.

303.    To facilitate their fraudulent scheme, Defendants closely guarded the pricing structures and sales figures for their analog insulins.  In particular, each Defendant concealed the net prices it offered to the PBM Conspirators and its use of a significant portion of the Distributor Prices to fund the kickbacks paid to the PBM Conspirators.

304.    Defendants also endeavored to conceal their fraudulent conduct by signing confidentiality agreements with participants in the supply chain that knew the net prices.

---

[17] *See* Form 10-Q, Eli Lilly and Company (May 1, 2017), available at https://www.documentcloud.org/documents/4113102-Eli-Lilly-March-2017-Form-10-Q.html#document/p45/a384369.

[18] *See* "*We Either Buy Insulin Or We Die*", N.Y Times. Jun. 13, 2019, available at https://www.nytimes.com/2019/06/13/opinion/insulin-price-costs.html.

305.    Information regarding the government investigation of Defendants' alleged unlawful conduct in the analog insulin market was not made public until November 2016.

306.    Given the government's role as the single largest healthcare payor in the U.S., the government's inability to uncover any evidence of Defendants' Price Inflation Scheme until late 2016 demonstrates that Plaintiffs and Class Members could not have discovered Defendants' fraud prior to that time.

307.    Further, Defendants made misleading public statements regarding price increases and their actual profits from the sale of insulin drugs that concealed Defendants' fraud.  For example, in 2017, Lilly spokesperson Julie Williams stated:

> There is a wide and growing discrepancy between the published "list price" Lilly sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price that a manufacturer sets as a starting point for negotiations with federal and state governments, private insurers, and pharmacy benefit managers to gain formulary access. Manufacturers also use list price in negotiations with wholesalers and others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price.  For example, the net price for Humalog – our most commonly used insulin – increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.[19]

308.    Similarly, on November 30, 2016, Novo issued a press release regarding benchmark prices and actual profits that stated:

> As a first step, we've taken a position on affordability, outlining three tenets that will be our focus.  One is creating more pricing predictability so customers like pharmacy benefit managers (PBMs) and payers can effectively anticipate and budget for our price increases.  We will support that by limiting any potential

---

[19] *See* http://www.healthline.com/diabetesmine/high-cost-insulin-and-plea-to-lilly#4.

future list price increases for our medicines to no more than single-digit percentages annually.  This is one action we are taking immediately.

A second area of focus is transforming the drug pricing system, which is incredibly complex and has resulted in a lot of confusion around what patients pay for medicines.  News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade.  In other words, a list price increase by XX percent leads to an automatic XX percent profit for the drug maker.  We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases.  However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers.  This is necessary in order for our medicines to stay on their preferred drug list or formulary.  The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price."  The net price more closely reflects our actual profits.

309.    Defendants made these public statements to conceal their unlawful scheme and enterprise.

310.    These statements were false and misleading because, *inter alia*, they failed to disclose to Plaintiffs and Class Members that the increased prices that distributors were forced to pay for Defendants' analog insulin products were not a function of the need to preserve Defendants' actual profits or other appropriate market forces.

311.    Rather, Defendants' price increases were engineered to enable them to set the "spread" for the PBM Conspirators to receive their substantial kickbacks and to ensure that Defendants could recoup the kickbacks from the Distributor Prices that Class Members paid for Defendants' analog insulin products.

312.    Plaintiffs and the Class Members could not have discovered the violations alleged herein earlier than late 2016 because Defendants acted in secret, concealed their unlawful and fraudulent conduct, and fraudulently concealed their activities.

313.    Because of Defendants' fraudulent concealment of their unlawful conduct and pattern of racketeering activity, Plaintiffs and the Classes are entitled to the tolling of any statute of limitations applicable to their claims.

## VI.  CLASS ACTION ALLEGATIONS

314.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of the Class.  The Class consists of all persons or entities that purchased NovoLog, Humalog, Lantus, and Levemir directly from the Defendants in the United States and its territories and possessions during the Class Period, which ranges from January 1, 2009 through the present.  During the Class Period, Plaintiffs purchased: NovoLog and Levemir directly from Novo; Humalog directly from Lilly; and Lantus directly from Sanofi.

315.    Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities are excluded from the Class.

316.    Plaintiffs believe that there are dozens of members of the Class that are geographically dispersed throughout the United States.  As a result, joinder of all Class Members is impracticable.

317.    The members of the Class are readily identifiable from information and records maintained by Defendants.

318.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs' interests are not antagonistic to the claims of the other Class Members, and Plaintiffs possess no material conflicts with any other Class Member that would make class certification inappropriate.

319.     Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.  Plaintiffs and all members of the Class directly purchased NovoLog, Humalog, Lantus, and Levemir from Defendants, and therefore possess the requisite standing.

320.     Plaintiffs will fairly and adequately protect and represent the interests of all Class Members.  Plaintiffs' interests are consistent with, and not antagonistic to, those of the members of the Class.

321.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular expertise pursuing class action litigation involving alleged violations of the RICO laws.

322.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class.  As a result, determining damages with respect to the Class as a whole is appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

323.     The predominant common legal and factual questions applicable to all Class Members include, but are not limited to, the following:

a.   Whether Defendants and their co-conspirators formed association-in-fact enterprises for the common purpose of securing favorable formulary positions through which they artificially increased the Distributor Prices and benchmark prices of NovoLog, Humalog, Lantus, and Levemir in the United States;

b.   The duration and extent of Defendants' Price Inflation Scheme and the conspiracy to maintain that scheme;

c.   Whether Defendants and their co-conspirators were participants in the enterprises alleged herein;

d.   The effect of the enterprises on the Distributor Prices of NovoLog, Humalog, Lantus, and Levemir in the United States during the Class Period;

e.   Whether Defendants' conduct caused artificially inflated prices for NovoLog, Humalog, Lantus, and Levemir;

f.   Whether Defendants committed mail and wire fraud;

g.   Whether Defendants' acts of mail and wire fraud constituted a pattern of racketeering activity;

h.   Whether Defendants' pattern of racketeering activity satisfied the long-term or short-term continuity requirement of the federal and New Jersey RICO statutes; and

i.   Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other Class Members.

324.   Those common questions do not vary among the members of the Class.  As a result, the Court and the jury may resolve those issues without reference to the individual circumstances of any Class Member.

325.   Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all Class Members.  Such treatment will permit many similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

326.    The benefits of proceeding through the class mechanism, including providing all Class Members a method for obtaining redress on claims that they could not practicably pursue individually, substantially outweigh potential difficulties in the management of this litigation as a class action.

327.    Plaintiffs know of no special difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against Novo)

328.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

329.    Plaintiffs bring this claim on behalf of the Class against Novo pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Novo's violations of 18 U.S.C. § 1962(c).

330.    Novo is a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

331.    All Class Members are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Novo's wrongful conduct.

### A.  The Levemir/NovoLog Pricing Enterprise

332.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

333.     Novo formed such an association-in-fact enterprise (the "Levemir/NovoLog Pricing Enterprise") that consists of: (a) Novo, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

334.     The Levemir/NovoLog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Novo and the PBM Conspirators by providing the PBM Conspirators with the largest possible spread between the benchmark and actual net selling price for Novo's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, NovoLog, in exchange for securing exclusive, or at least favorable, formulary positions for those medications as treatments for Type 1 and 2 diabetes.

335.     To accomplish this purpose, the Levemir/NovoLog Pricing Enterprise systematically inflated the Distributor Prices and benchmark prices of Levemir and Novolog and represented—either affirmatively or through half-truths and omissions—to Plaintiffs, Class Members, and Defrauded Consumers that the Distributor Prices and benchmark prices of Levemir and Novolog fairly and accurately reflected the actual cost of those medications in a competitive marketplace free of kickbacks and other illicit conduct.

336.     The Levemir/Novolog Pricing Enterprise concealed from Plaintiffs, the Class, and Defrauded Consumers the existence and amount of steep rebates that Novo supplied to the PBM Conspirators in connection with the purchases of Levemir and Novolog that they effectively controlled.  These rebates amounted to 25% or more of the medications' benchmark prices.

337.    The Levemir/NovoLog Pricing Enterprise also concealed from the Plaintiffs, the Class, and Defrauded Consumers the purpose of these rebates.  The difference between the benchmark price and the real prices of Levemir and NovoLog negotiated by the PBM Conspirators produced increased profits for them.

338.    Thus, Novo's large rebates served to ensure that the PBM Conspirators would place and maintain Levemir and NovoLog in preferred or favorable positions on the PBM Conspirators' formularies.

339.    By maintaining those favorable formulary positions for Levemir and NovoLog, the Levemir/NovoLog Pricing Enterprise ensured that a larger number of prescriptions for those medications would be written and filled.

340.    The Levemir/NovoLog Pricing Enterprise thus advanced the joint interests of Novo and the PBM Conspirators by producing higher sales (and therefore profits) for Novo and larger spreads (and therefore profits) for the PBMs.

341.    The Price Inflation Scheme the Levemir/NovoLog Pricing Enterprise perpetrated was dependent upon Novo charging Plaintiffs and Class Members—all of whom are direct purchasers of analog insulin drugs from Novo—artificially inflated prices for Levemir and NovoLog to fund the kickbacks that Novo paid to the PBM Conspirators.

342.    The persons engaged in the Levemir/NovoLog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Novo spearheads.

343.    To facilitate the Levemir/NovoLog Pricing Enterprise, Novo and the PBM Conspirators engage in regular communications by which they share pricing information, including data concerning the Distributor Prices and benchmark prices of Levemir and NovoLog

and the rebates payable to the PBM Conspirators, and otherwise plot to advance their shared interests.

344.    Novo and the PBM Conspirators functioned as a continuing unit for the purposes of advancing the shared interests of the Levemir/NovoLog Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

345.    At all relevant times, the PBM Conspirators were aware of the conduct in which Novo and the other PBM Conspirators engaged to advance the shared interests of the members of the Levemir/NovoLog Pricing Enterprise.

346.    All of the PBM Conspirators were knowing and willing participants in the Levemir/NovoLog Pricing Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

347.    The PBM Conspirators all struck rebate deals with Novo to conceal the true prices of Levemir and NovoLog and to profit from the inflated rebates Novo agreed to pay to the PBM Conspirators.

348.    The PBM Conspirators represented to Plaintiffs, Class Members, and the Defrauded Consumers that the rebates the PBM Conspirators negotiated saved health care purchasers money on their prescription needs.

349.    When the PBM Conspirators made those representations, they knew that the rebates did not actually decrease the costs of Levemir and NovoLog for Plaintiffs, Class Members, and Defrauded Consumers.  Rather, because of the Price Inflation Scheme implemented by the members of the Levemir/NovoLog Pricing Enterprise, Novo's published Distributor Prices and benchmark prices for Levemir and NovoLog were falsely inflated.

350.     In the absence of the kickbacks paid by Novo to the PBM Conspirators, those PBMs would have disclosed Novo's fraudulent representations concerning the Distributor Prices and benchmark prices of Levemir and NovoLog.

351.     As a result of those kickbacks, however, the PBM Conspirators perpetuated the Levemir/Novolog Pricing Enterprise's scheme and reaped substantial profits.

352.     Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Novo's analog insulins, the PBM Conspirators did not challenge Novo's reported benchmark prices, terminate their role in the Levemir/NovoLog Pricing Enterprise, or disclose publicly that the Levemir and NovoLog Distributor Prices and benchmark prices that Plaintiffs, Class Members, and Defrauded Consumers were forced to pay did not accurately reflect the price PBMs actually paid for those medications.

353.     Novo could not have accomplished the purpose of the Levemir/NovoLog Pricing Enterprise without the assistance of the PBM Conspirators.

354.     For Novo to profit from the scheme, the PBM Conspirators needed to convince health care payers and plan sponsors to approve formularies on which Levemir and NovoLog were given favorable treatment.

355.     The PBM Conspirators accomplished that objective by making a series of material misrepresentations and omissions.  In particular, they told clients, potential clients, and investors that they secured significant discounts for the Levemir and NovoLog utilized by consumers.

356.     However, these discounts were only significant because the benchmark prices were artificially inflated pursuant to the Levemir/NovoLog Pricing Enterprise's Price Inflation

Scheme.  The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real prices of Levemir and NovoLog.

357.    The Levemir/NovoLog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Class Members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

358.    The impacts of the Levemir/NovoLog Pricing Enterprise's Price Inflation Scheme persist to this day—*i.e*., the artificially inflated spread between the Distributor Prices and benchmark prices of Levemir and NovoLog, on the one hand, and the actual prices of those medications, on the other hand, persist.

359.    Thus, Novo and the PBM Conspirators continue to make large profits because of the massive spread between the Distributor Prices and benchmark prices of Levemir and NovoLog and the actual acquisition cost for the PBM Conspirators.

360.    In contrast, the Levemir/NovoLog Pricing Enterprise's Price Inflation Scheme forces Plaintiffs and other Class Members—the direct purchasers of analog insulin drugs—to pay artificially inflated Distributor Prices that enable Novo to pay kickbacks to the PBM Conspirators.

   **B.  Novo Conducted and Participated in the Conduct of the Levemir/NovoLog Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

361.    During the Class Period, Novo conducted and participated in the conduct of the affairs of the Levemir/NovoLog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

362.     Novo exerted control over the Levemir/NovoLog Pricing Enterprise and participated in the operation and management of the affairs of the Levemir/NovoLog Pricing Enterprise, directly or indirectly, in the following ways:

a.  Novo established and published the Levemir and NovoLog Distributor Prices and benchmark prices;

b.  Novo regularly raised the published Levemir and NovoLog Distributor Prices and benchmark prices to facilitate the Price Inflation Scheme;

c.  Novo granted the PBM Conspirators substantial rebates representing discounts from the Levemir and NovoLog benchmark prices in exchange for the PBM Conspirators' commitment to give Levemir and NovoLog exclusive, or at least favorable, formulary placement;

d.  Novo concealed from Plaintiffs, Class Members, and the Defrauded Consumers the amount and purpose of the rebates;

e.  Novo intended that the PBM Conspirators would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Levemir and NovoLog) saved health care purchasers money on their prescription needs and knew that the PBM Conspirators did distribute those material misrepresentations; and

f.  Novo made repeated materially misleading statements to Plaintiffs, Class Members, and the Defrauded Consumers regarding the supposed Distributor Prices and benchmark prices of Levemir and NovoLog without stating that those prices differed substantially from the prices negotiated by the PBM Conspirators and without disclosing the rebates that Novo was paying the PBM Conspirators.

363.     Novo's pattern of racketeering activity involved thousands of separate instances where Novo and its co-conspirators used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Scheme.

364.     For example, on or about June 16, 2010, Novo utilized the interstate wires to represent to PDC that the Distributor Price of Levemir® FlexPens® 3ML/5 on June 16, 2010, was $174.93.   When representing the price to PDC, Novo concealed the Price Inflation Scheme and concealed that Novo would pay a substantial portion of the quoted Distributor Prices to the PBM Conspirators to fund that scheme.

365.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on approximately 228 different occasions that the Distributor Price of Levemir® FlexPen® 5X3ML was various prices starting at $158.15 in January 2009 and increasing to $333.12  by September 2014.

366.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on approximately 83 different occasions that the Distributor Price of Levemir® FlexTouch® was various prices starting at $287.96 in June 2014 and increasing to $403.50 by May 2016.

367.     Based on information currently available, during the class period, Novo utilized the interstate wires to represent to FWK on approximately 176 different occasions that the Distributor Price of Levemir® 100 unit/ML 10 ML vile was various prices starting at $81.11 in January 2009 and increasing to $269.00 by May 2016.

368.     In all circumstances, Novo concealed the Price Inflation Scheme and concealed that Novo would pay a substantial portion of the quoted Distributor Prices to the PBM Conspirators to fund that scheme.

369.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on approximately 303 different occasions that the Distributor Price of NovoLog® FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

370.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on approximately 39 different occasions that the Distributor Price of NovoLog® Penfill® 3ML was various prices starting at $161.03 in January 2009 and increasing to $415.10 by October 2015.

371.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on 291 different occasions that the Distributor Price of NovoLog® 100 unit/ML 10 ML vial was various prices starting at $86.69 in January 2009 and increasing to $236.70 by May 2016.

372.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on approximately 268 different occasions that the Distributor Price of NovoLog® Mix 70/30 FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

373.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on approximately 168 different occasions that the Distributor Price of NovoLog® Mix 70/30 100 unit/ML 10 ML vial was various prices starting at $86.69 in January 2009 and increasing to $245.50 by April 2016.

374.    In all circumstances, Novo concealed the Price Inflation Scheme and concealed that Novo would pay a substantial portion of the quoted Distributor Prices to the PBM Conspirators to fund that scheme.

375.     Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

376.     By means of that pattern of racketeering activity, Novo and the PBM Conspirators defrauded Plaintiffs, Class Members, and the Defrauded Consumers.

377.     Novo's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs, Class Members, and the Defrauded Consumers.

378.     Novo and the PBM Conspirators intentionally crafted the Levemir and NovoLog Price Inflation Scheme to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiffs, Class Members, and Defrauded Consumers, all of whom paid excessive prices for Levemir and NovoLog.

379.     When Novo designed and implemented its illicit scheme, Novo was cognizant that Plaintiffs and Class Members rely on the integrity of the pharmaceutical companies in setting Distributor Prices and benchmark prices.

380.     The pattern of racketeering activity alleged herein and the Levemir/NovoLog Pricing Enterprise are separate and distinct from each other.  Likewise, Novo is distinct from the Levemir/NovoLog Pricing Enterprise.

381.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Novo's Use of the U.S. Mail and Interstate Wire Facilities**

382.     The Levemir/NovoLog Pricing Enterprise engaged in and affected interstate

81

commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Distributor Prices and benchmark prices of Levemir and Novolog; the receipt of payments by Novo from Plaintiffs and Class Members for analog insulin drug purchases; Novo's payment of substantial rebates to the PBM Conspirators in exchange for the favorable placement of Levemir and NovoLog on the PBM Conspirators' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Novo paid to the PBM Conspirators.

383.    During the Class Period, the Levemir/NovoLog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

384.    The nature and pervasiveness of the Levemir and NovoLog Price Inflation Scheme, which was orchestrated out of the corporate headquarters of Novo and each PBM Conspirator, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

385.    For example, to perpetrate the Levemir and NovoLog Price Inflation Scheme, Novo used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Distributor Prices and benchmark prices of Levemir and NovoLog.  Novo distributed those fraudulent representations in:

> a.   Marketing materials concerning Novo's Levemir and NovoLog benchmark prices that Novo transmitted to health care payers and health care providers located across the country;

b.   The annual written disclosures that Novo made to the publishers of benchmark price compendia regarding the Levemir and NovoLog benchmark prices and their subsequent mark-ups;

c.   Written materials provided to the PBM Conspirators and telephonic discussions with those entities regarding Levemir and NovoLog markups and benchmark prices and the rebates paid by Novo to the PBM Conspirators related to those medications;

d.   Numerous e-mails and text messages between Novo and the PBM Conspirators regarding the operation of the Levemir/NovoLog Pricing Enterprise's Price Inflation Scheme; and

e.   Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the benchmark prices of Levemir and NovoLog; (ii) the existence, amount, and purpose of the Levemir and NovoLog rebates; and (iii) the true costs of Levemir and NovoLog after the payment of Novo's rebates to the PBM Conspirators.

386.   Novo also employed the U.S. Mail and interstate wires to provide inflated Distributor Prices to Plaintiffs and Class Members and to solicit and receive payments from Plaintiffs and Class Members for purchases of Levemir and NovoLog.  Those payments constituted the wrongful proceeds of the racketeering activity in which Novo and the PBM Conspirators engaged.

387.   For example, on or about June 16, 2010, Novo utilized interstate wires to represent to PDC that the Distributor Price of Levemir Flexpen 3ML/5 was $174.93 without

disclosing the Price Inflation Scheme or that Novo would pay a substantial portion of that purchase price to the PBM Conspirators to fund that scheme.

388.    The materially false and misleading representations that Novo made in furtherance of the Price Inflation Scheme that the Levemir/NovoLog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Levemir and NovoLog pricing, and forestall changes to healthcare payers' historical practice of utilizing Levemir and NovoLog benchmark prices as a basis for prescription reimbursement.

**D.   The Damages Caused by Novo's Levemir and NovoLog Price Inflation Scheme**

389.    Novo's pattern of racketeering activity has directly and proximately caused Plaintiffs and Class Members to be injured in their business or property because Plaintiffs and Class Members paid artificially inflated Distributor Prices for Levemir and/or NovoLog.

390.    But for the fraudulent representations and material omissions made by Novo and the PBM Conspirators, and the fraudulent pricing scheme the Levemir/NovoLog Pricing Enterprise employed, Plaintiffs and the Class Members would have paid less for the Levemir and NovoLog they purchased.

391.    Even though the Levemir/NovoLog Pricing Enterprise was operated to provide Novo with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo's competitors.

392.    Plaintiffs and those similarly situated were most directly harmed by Novo's fraud and pattern of racketeering activity.  There are no other Plaintiffs or class of plaintiffs better situated to seek a remedy for the economic harms that Novo's fraudulent scheme caused to direct purchasers of Levemir and NovoLog from Novo.

393.    By virtue of these violations of 18 U.S.C. § 1962(c), Novo is liable to

Plaintiffs and the Class Members for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

## SECOND CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against Lilly)

394.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

395.     Plaintiffs bring this claim on behalf of the Class against Lilly pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Lilly's violations of 18 U.S.C. § 1962(c).

396.     Lilly is a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

397.     All Class Members are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Lilly's wrongful conduct.

### A.  The Humalog Pricing Enterprise

398.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

399.     Lilly formed such an association-in-fact enterprise (the "Humalog Pricing Enterprise") that consists of: (a) Lilly, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

400.    The Humalog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Lilly and the PBM Conspirators by providing the PBM Conspirators with the largest possible spread between the benchmark and actual net selling price for Lilly's rapid-acting analog insulin product, Humalog, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

401.    To accomplish this purpose, the Humalog Pricing Enterprise systematically inflated the Distributor Prices and benchmark prices of Humalog and represented—either affirmatively or through half-truths and omissions—to Plaintiffs, Class Members, and Defrauded Consumers that the Distributor Prices of Humalog fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

402.    The Humalog Pricing Enterprise concealed from Plaintiffs, the Class, and Defrauded Consumers the existence and amount of steep rebates that Lilly supplied to the PBM Conspirators in connection with the purchases of Humalog that they effectively controlled. These rebates amounted to 25% or more of Humalog's benchmark prices.

403.    The Humalog Pricing Enterprise also concealed from Plaintiffs, the Class, and Defrauded Consumers the purpose of these rebates.  The difference between the benchmark price and the real price of Humalog negotiated by the PBM Conspirators produced increased profits for them.

404.    Thus, Lilly's large rebates served to ensure that the PBM Conspirators would place and maintain Humalog in preferred or favorable positions on the PBM Conspirators' formularies.

405.     By maintaining those favorable formulary positions for Humalog, the Humalog Pricing Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

406.     The Humalog Pricing Enterprise thus advanced the joint interests of Lilly and the PBM Conspirators by producing higher sales (and therefore profits) for Lilly and larger spreads (and therefore profits) for the PBMs.

407.     The Price Inflation Scheme the Humalog Pricing Enterprise perpetrated was dependent upon Lilly charging Plaintiff and Class Members—all of whom are direct purchasers of Humalog from Lilly—artificially inflated prices for Humalog to fund the kickbacks that Lilly paid to the PBM Conspirators.

408.     The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Lilly spearheads.

409.     To facilitate the Humalog Pricing Enterprise, Lilly and the PBM Conspirators engage in regular communications by which they share pricing information, including data concerning the Distributor Prices and benchmark prices of Humalog and the rebates payable to the PBM Conspirators, and otherwise plot to advance their shared interests.

410.     Lilly and the PBM Conspirators functioned as a continuing unit for the purposes of advancing the shared interests of the Humalog Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

411.    At all relevant times, the PBM Conspirators were aware of the conduct in which Lilly and the other PBM Conspirators engaged to advance the shared interests of the members of the Humalog Pricing Enterprise.

412.    All of the PBM Conspirators were knowing and willing participants in the Humalog Pricing Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

413.    The PBM Conspirators all struck rebate deals with Lilly to conceal the true prices of Humalog and to profit from the inflated rebates Lilly agreed to pay to the PBM Conspirators.

414.    The PBM Conspirators represented to Plaintiffs, Class Members, and the Defrauded Consumers that the rebates the PBM Conspirators negotiated saved health care purchasers money on their prescription needs.

415.    When the PBM Conspirators made those representations, they knew that the rebates did not actually decrease the cost of Humalog for Plaintiffs, Class Members, and Defrauded Consumers.  Rather, because of the Price Inflation Scheme implemented by the members of the Humalog Pricing Enterprise, Lilly's published Distributor Prices and benchmark prices for Humalog were falsely inflated.

416.    In the absence of the kickbacks paid by Lilly to the PBM Conspirators, those PBMs would have disclosed Lilly's fraudulent representations concerning the Distributor Prices and benchmark prices of Humalog.

417.    As a result of those kickbacks, however, the PBM Conspirators perpetuated the Humalog Pricing Enterprise's scheme and reaped substantial profits.

418.    Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Lilly's analog insulins, the PBM

Conspirators did not challenge Lilly's reported benchmark prices, terminate their role in the Humalog Pricing Enterprise, or disclose publicly that the Humalog Distributor Prices and benchmark prices that Plaintiffs, Class Members, and Defrauded Consumers were forced to pay did not accurately reflect the price PBMs actually paid for that medication.

419.    Lilly could not have accomplished the purpose of the Humalog Pricing Enterprise without the assistance of the PBM Conspirators.

420.    For Lilly to profit from the scheme, the PBM Conspirators needed to convince health care payers and plan sponsors to approve formularies on which Humalog was given favorable treatment.

421.    The PBM Conspirators accomplished that objective by making a series of material misrepresentations and omissions.  In particular, they told clients, potential clients, and investors that they secured significant discounts for the Humalog utilized by consumers.

422.    However, these discounts were only significant because the benchmark prices were artificially inflated pursuant to the Humalog Pricing Enterprise's Price Inflation Scheme. The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Humalog.

423.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Class Members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

424.    The impacts of the Humalog Pricing Enterprise's Price Inflation Scheme persist to this day—*i.e.*, the artificially inflated spread between the Distributor Prices and benchmark prices of Humalog, on the one hand, and the actual prices of those medications, on the other hand, persist.

425.     Thus, Lilly and the PBM Conspirators continue to make large profits because of the massive spread between the Distributor Prices and benchmark prices of Humalog and the actual acquisition cost for the PBM Conspirators.

426.     In contrast, the Humalog Pricing Enterprise's Price Inflation Scheme forces Plaintiffs and other Class Members—the direct purchasers of analog insulin drugs—to pay artificially inflated Distributor Prices that enable Lilly to pay kickbacks to the PBM Conspirators.

**B.  Lilly Conducted and Participated in the Conduct of the Humalog Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

427.     During the Class Period, Lilly conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

428.     Lilly exerted control over the Humalog Pricing Enterprise and participated in the operation and management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

    a.  Lilly established and published the Humalog Distributor Prices and benchmark prices;

    b.  Lilly regularly raised the published Humalog Distributor Prices and benchmark prices to facilitate the Price Inflation Scheme;

    c.  Lilly granted the PBM Conspirators substantial rebates representing discounts from the Humalog benchmark prices in exchange for the PBM Conspirators' commitment to give Humalog exclusive or favorable formulary placement;

    d.   Lilly concealed from Plaintiffs, Class Members and the Defrauded Consumers the amount and purpose of the rebates;

    e.   Lilly intended that the PBM Conspirators would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Humalog) saved health care purchasers money on their prescription needs and knew that the PBM Conspirators did distribute those material misrepresentations; and

    f.   Lilly made repeated materially misleading statements to Plaintiffs, Class Members, and the Defrauded Consumers regarding the supposed Distributor Prices and benchmark prices of Humalog without stating that those prices differed substantially from the prices negotiated by the PBM Conspirators and without disclosing the rebates that Lilly was paying the PBM Conspirators.

429.    Lilly's pattern of racketeering activity involved thousands of separate instances where Lilly and its co-conspirators used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Scheme.

430.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 155 different occasions that the Distributor Price of Humalog® Cartridge 5X3ML was various prices starting at $159.70 in February 2009 and increasing to $440.40 in April 2016,

431.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 24 different occasions that the Distributor Price of Humalog® KwikPen® 2X3ML was various prices starting at $313.19 in July 2015 and increasing to $366.12 by May 2016,

432.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 87 different occasions that the Distributor Price of Humalog® Pen Pref 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

433.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 16 different occasions that the Distributor Price of Humalog® 50/50 Pen 5X3ML was various prices starting at $166.05 in February 2009 and increasing to $192.45 by August 2010.

434.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 70 different occasions that the Distributor Price of Humalog® 75/25 Pen 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

435.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 214 different occasions that the Distributor Price of Humalog® 75/25 vial was various prices starting at $86.00 in January 2009 and increasing to $245.60 by May 2016.

436.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 377 different occasions that the Distributor Price of Humalog® 100Units/ML vial was various prices starting at $86.00 in January 2009 and increasing to $237.00 by May 2016.

437.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 137 different occasions that the

Distributor Price of Humalog® Mix 50/50 KwikPen® 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

438.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 80 different occasions that the Distributor Price of Humalog® Mix 50/50 vial was various prices starting at $86.00 in January 2009 and increasing to $230.80 by August 2015.

439.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on approximately 303 different occasions that the Distributor Price of Humalog® Mix 75/25 KwikPen® was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

440.    In all circumstances, Lilly concealed the Price Inflation Scheme and concealed that Lilly would pay a substantial portion of the quoted Distributor Prices to the PBM Conspirators to fund that scheme.

441.    Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

442.    By means of that pattern of racketeering activity, Lilly and the PBM Conspirators defrauded Plaintiffs, Class Members, and the Defrauded Consumers.

443.    Lilly's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs, Class Members, and the Defrauded Consumers.

444.    Lilly and the PBM Conspirators intentionally crafted the Humalog Price Inflation Scheme to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiffs, Class Members, and Defrauded Consumers, all of whom paid excessive prices for Humalog.

445.    When Lilly designed and implemented its illicit scheme, Lilly was cognizant that Plaintiffs and Class Members rely on the integrity of the pharmaceutical companies in setting Distributor Prices and benchmark prices.

446.    The pattern of racketeering activity alleged herein, and the Humalog Pricing Enterprise, are separate and distinct from each other.  Likewise, Lilly is distinct from the Humalog Pricing Enterprise.

447.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Lilly's Use of the U.S. Mail and Interstate Wire Facilities**

448.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Distributor Prices and benchmark prices of Humalog; the receipt of payments by Lilly from Plaintiffs and Class Members for analog insulin drug purchases; Lilly's payment of substantial rebates to the PBM Conspirators in exchange for the favorable placement of Humalog on the PBM Conspirators' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Lilly paid to the PBM Conspirators.

449.    During the Class Period, the Humalog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

450.    The nature and pervasiveness of the Humalog Price Inflation Scheme, which was orchestrated out of the corporate headquarters of Lilly and each PBM Conspirator, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

451.    For example, to perpetrate the Humalog Price Inflation Scheme, Lilly used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Distributor Prices and benchmark prices of Humalog. Lilly distributed those fraudulent representations in:

  a.   Marketing materials concerning Lilly's benchmark prices that Lilly transmitted to healthcare payers and healthcare providers located across the country;

  b.   The annual written disclosures that Lilly made to the publishers of benchmark price compendia regarding Humalog benchmark prices and Lilly's subsequent mark-ups;

  c.   Written materials provided to the PBM Conspirators and telephonic discussions with those entities regarding Humalog markups and benchmark prices and the rebates paid by Lilly to the PBM Conspirators related to that medication;

  d.   Numerous e-mails and text messages between Lilly and the PBM Conspirators regarding the operation of the Humalog Pricing Enterprise's Price Inflation Scheme, and pattern of racketeering activity; and

e.   Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the benchmark prices of Humalog; (ii) the existence, amount, and purpose of the Humalog rebates; and (iii) the true costs of Humalog after the payment of Lilly's rebates to the PBM Conspirators.

452.   Lilly also employed the U.S. Mail and interstate wires to provide inflated Distributor Prices to Plaintiffs and Class Members and to solicit and receive payments from Plaintiff and Class Members for purchases of Humalog.  Those payments constituted the wrongful proceeds of the racketeering activity in which Lilly and the PBM Conspirators engaged.

453.   The materially false and misleading representations that Lilly made in furtherance of the Price Inflation Scheme that the Humalog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Humalog pricing, and forestall changes to healthcare payers' historical practice of utilizing Humalog benchmark prices as a basis for prescription reimbursement.

**D.   The Damages Caused by Lilly's Humalog Price Inflation Scheme**

454.   Lilly's pattern of racketeering activity has directly and proximately caused Plaintiffs and Class Members to be injured in their business or property because Plaintiffs and Class Members paid artificially inflated Distributor Prices for Humalog.

455.   But for the fraudulent representations and material omissions made by Lilly and the PBM Conspirators, and the fraudulent pricing scheme the Humalog Pricing Enterprise employed, Plaintiff and the Class Members would have paid less for Humalog.

456.     Even though the Humalog Pricing Enterprise was operated to provide Lilly with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Lilly's competitors.

457.     Plaintiffs and those similarly situated were most directly harmed by Lilly's fraud and pattern of racketeering activity.  There are no other Plaintiffs or class of plaintiffs better situated to seek a remedy for the economic harms that Lilly's fraudulent scheme caused to direct purchasers of Humalog from Lilly.

458.     By virtue of these violations of 18 U.S.C. § 1962(c), Lilly is liable to Plaintiffs and Class Members for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

### THIRD CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against Sanofi)

459.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

460.     Plaintiffs bring this claim on behalf of the Class against Sanofi pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Sanofi's violations of 18 U.S.C. § 1962(c).

461.     Sanofi is a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

462.     All Class Members are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Sanofi's wrongful conduct.

## A. The Lantus Pricing Enterprise

463.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

464.     Sanofi formed such an association-in-fact enterprise (the "Lantus Pricing Enterprise") that consists of: (a) Sanofi, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

465.     The Lantus Pricing Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Sanofi and the PBM Conspirators by providing the PBM Conspirators with the largest possible spread between the benchmark and actual net selling price for Sanofi's long-acting analog insulin product, Lantus, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

466.     To accomplish this purpose, the Lantus Pricing Enterprise systematically inflated the Distributor Prices and benchmark prices of Lantus and represented—either affirmatively or through half-truths and omissions—to Plaintiffs, Class Members, and Defrauded Consumers that the Distributor Prices of Lantus fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

467.     The Lantus Pricing Enterprise concealed from Plaintiffs, the Class, and Defrauded Consumers the existence and amount of steep rebates that Sanofi supplied to the PBM

Conspirators in connection with the purchases of Lantus that they effectively controlled.  These rebates amounted to 25% or more of Lantus's benchmark prices.

468.    The Lantus Pricing Enterprise also concealed from Plaintiffs, the Class, and Defrauded Consumers the purpose of these rebates.  The difference between the benchmark price and the real price of Lantus negotiated by the PBM Conspirators produced increased profits for them.

469.    Thus, Sanofi's large rebates served to ensure that the PBM Conspirators would place and maintain Lantus in preferred or favorable positions on the PBM Conspirators' formularies.

470.    By maintaining those favorable formulary positions for Lantus, the Lantus Pricing Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

471.    The Lantus Pricing Enterprise thus advanced the joint interests of Sanofi and the PBM Conspirators by producing higher sales (and therefore profits) for Sanofi and larger spreads (and therefore profits) for the PBMs.

472.    The Price Inflation Scheme the Lantus Pricing Enterprise perpetrated was dependent upon Sanofi charging Plaintiffs and Class Members—all of whom are direct purchasers of Lantus from Sanofi—artificially inflated prices for Lantus to fund the kickbacks that Sanofi paid to the PBM Conspirators.

473.    The persons engaged in the Lantus Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Sanofi spearheads.

474.    To facilitate the Lantus Pricing Enterprise, Sanofi and the PBM Conspirators engage in regular communications by which they share pricing information, including data concerning the Distributor Prices and benchmark prices of Lantus and the rebates payable to the PBM Conspirators, and otherwise plot to advance their shared interests.

475.    Sanofi and the PBM Conspirators functioned as a continuing unit for the purposes of advancing the shared interests of the Lantus Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

476.    At all relevant times, the PBM Conspirators were aware of the conduct in which Sanofi and the other PBM Conspirators engaged to advance the shared interests of the members of the Lantus Pricing Enterprise.

477.    All of the PBM Conspirators were knowing and willing participants in the Lantus Pricing Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

478.    The PBM Conspirators all struck rebate deals with Sanofi to conceal the true prices of Lantus and to profit from the inflated rebates Sanofi agreed to pay to the PBM Conspirators.

479.    The PBM Conspirators represented to Plaintiffs, Class Members, and the Defrauded Consumers that the rebates the PBM Conspirators negotiated saved health care purchasers money on their prescription needs.

480.    When the PBM Conspirators made those representations, they knew that the rebates did not actually decrease the cost of Lantus for Plaintiffs, Class Members, and Defrauded Consumers.  Rather, because of the Price Inflation Scheme implemented by the members of the

Lantus Pricing Enterprise, Sanofi's published Distributor Prices and benchmark prices for Lantus were falsely inflated.

481.   In the absence of the kickbacks paid by Sanofi to the PBM Conspirators, those PBMs would have disclosed Sanofi's fraudulent representations concerning the Distributor Prices and benchmark prices of Lantus.

482.   As a result of those kickbacks, however, the PBM Conspirators perpetuated the Lantus Pricing Enterprise's scheme and reaped substantial profits.

483.   Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Sanofi's analog insulins, the PBM Conspirators did not challenge Sanofi's reported benchmark prices, terminate their role in the Lantus Pricing Enterprise, or disclose publicly that the Lantus Distributor Prices and benchmark prices that Plaintiffs, Class Members, and Defrauded Consumers were forced to pay did not accurately reflect the price PBMs actually paid for that medication.

484.   Sanofi could not have accomplished the purpose of the Lantus Pricing Enterprise without the assistance of the PBM Conspirators.

485.   For Sanofi to profit from the scheme, the PBM Conspirators needed to convince healthcare payers and plan sponsors to approve formularies on which Lantus was given favorable treatment.

486.   The PBM Conspirators accomplished that objective by making a series of material misrepresentations and omissions.  In particular, they told clients, potential clients, and investors that they secured significant discounts for the Lantus utilized by consumers.

487.   However, these discounts were only significant because the benchmark prices were artificially inflated pursuant to the Lantus Pricing Enterprise's Price Inflation Scheme.  The

supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Lantus.

488.    The Lantus Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Class Members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

489.    The impacts of the Lantus Pricing Enterprise's Price Inflation Scheme persist to this day—*i.e*., the artificially inflated spread between the Distributor Prices and benchmark prices of Lantus, on the one hand, and the actual prices of that medication, on the other hand, persist.

490.    Thus, Sanofi and the PBM Conspirators continue to make large profits because of the massive spread between the Distributor Prices and benchmark prices of Lantus and the actual acquisition cost for the PBM Conspirators.

491.    In contrast, the Lantus Pricing Enterprise's Price Inflation Scheme forces Plaintiffs and other Class Members—the direct purchasers of analog insulin drugs—to pay artificially inflated Distributor Prices that enable Sanofi to pay kickbacks to the PBM Conspirators.

### B.  Sanofi Conducted and Participated in the Conduct of the Lantus Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity

492.    During the Class Period, Lantus conducted and participated in the conduct of the affairs of the Lantus Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

493.     Sanofi exerted control over the Lantus Pricing Enterprise and participated in the operation and management of the affairs of the Lantus Pricing Enterprise, directly or indirectly, in the following ways:

a.  Sanofi established and published the Lantus Distributor Prices and benchmark prices;

b.  Sanofi regularly raised the published Lantus Distributor Prices and benchmark prices to facilitate the Price Inflation Scheme;

c.  Sanofi granted the PBM Conspirators substantial rebates representing discounts from the Lantus benchmark prices in exchange for the PBM Conspirators' commitment to give Lantus exclusive or favorable formulary placement;

d.  Sanofi concealed from Plaintiffs, Class Members, and the Defrauded Consumers the amount and purpose of the rebates;

e.  Sanofi intended that the PBM Conspirators would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Lantus) saved healthcare purchasers money on their prescription needs and knew that the PBM Conspirators did distribute those material misrepresentations; and

f.  Sanofi made repeated materially misleading statements to Plaintiffs, Class Members, and the Defrauded Consumers regarding the supposed Distributor Prices and benchmark prices of Lantus without stating that those prices differed substantially from the prices negotiated by the PBM Conspirators and without disclosing the rebates that Sanofi was paying the PBM Conspirators.

494.    Sanofi's pattern of racketeering activity involved thousands of separate instances where Sanofi and its co-conspirators used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Scheme.

495.    For example, on or about February 13, 2009, Sanofi utilized the interstate wires to represent to PDC that the Distributor Price of Lantus Solostar Pens 3ML/5 was $166.05. Likewise, on or about May 15, 2009, Sanofi utilized the interstate wires to represent to PDC that the Distributor Price of Lantus 100 units/ml 10ML was $85.97.  In both circumstances, Sanofi concealed the Price Inflation Scheme and concealed that Sanofi would pay a substantial portion of the quoted Distributor Prices to the PBM Conspirators to fund that scheme.

496.    Based on information currently available, during the Class Period, Sanofi® utilized the interstate wires to represent to FWK on 87 different occasions that the Distributor Price of Lantus® Cartridges 5X3ML was various prices starting at $156.65 in January 2009 and increasing to $191.96 by February 2011.

497.    Based on information currently available, during the class period, Sanofi utilized the interstate wires to represent to FWK on 384 different occasions that the Distributor Price of Lantus® 100 units/ml 10ML was various prices starting at $81.10 in January 2009 and increasing to $248.51 by May 2016.

498.    Based on information currently available, during the class period, Sanofi utilized the interstate wires to represent to FWK on 378 different occasions that the Distributor Price of Lantus® Solostar® Pens 5X3ML was various prices starting at $156.65 in January 2009 and increasing to $372.76 by May 2016.

499.     In all circumstances, Sanofi concealed the Price Inflation Scheme and concealed that Sanofi would pay a substantial portion of the quoted Distributor Prices to the PBM Conspirators to fund that scheme.

500.      Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

501.     By means of that pattern of racketeering activity, Sanofi and the PBM Conspirators defrauded Plaintiffs, Class Members, and the Defrauded Consumers.

502.     Sanofi's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs, Class Members, and the Defrauded Consumers.

503.     Sanofi and the PBM Conspirators intentionally crafted the Lantus Price Inflation Scheme to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiffs, Class Members, and Defrauded Consumers, all of whom paid excessive prices for Lantus.

504.     When Sanofi designed and implemented its illicit scheme, Sanofi was cognizant that Plaintiffs and Class Members rely on the integrity of the pharmaceutical companies in setting Distributor Prices and benchmark prices.

505.     The pattern of racketeering activity alleged herein and the Lantus Pricing Enterprise are separate and distinct from each other.  Likewise, Sanofi is distinct from the Lantus Pricing Enterprise.

506.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Sanofi's Use of the U.S. Mail and Interstate Wire Facilities**

507.    The Lantus Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Distributor Prices and benchmark prices of Lantus; the receipt of payments by Sanofi from Plaintiffs and Class Members for analog insulin drug purchases; Sanofi's payment of substantial rebates to the PBM Conspirators in exchange for the favorable placement of Lantus on the PBM Conspirators' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Sanofi paid to the PBM Conspirators.

508.    During the Class Period, the Lantus Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

509.    The nature and pervasiveness of the Lantus Price Inflation Scheme, which was orchestrated out of the corporate headquarters of Sanofi and each PBM Conspirator, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

510.    For example, to perpetrate the Lantus Price Inflation Scheme, Sanofi used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false

and misleading information concerning the Distributor Prices and benchmark prices of Lantus. Sanofi distributed those fraudulent representations in:

    a.   Marketing materials concerning Sanofi's benchmark prices that Sanofi transmitted to health care payers and health care providers located across the country;

    b.   The annual written disclosures that Sanofi made to the publishers of benchmark price compendia regarding Lantus benchmark prices and Sanofi's mark-ups;

    c.   Written materials provided to the PBM Conspirators and telephonic discussions with those entities regarding Lantus markups and benchmark prices and the rebates paid by Sanofi to the PBM Conspirators related to that medication;

    d.   Numerous e-mails and text messages between Sanofi and the PBM Conspirators regarding the operation of the Lantus Pricing Enterprise's Price Inflation Scheme; and pattern of racketeering activity; and

    e.   Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the benchmark prices of Lantus; (ii) the existence, amount, and purpose of the Lantus rebates; and (iii) the true costs of Lantus after the payment of Sanofi's rebates to the PBM Conspirators.

511.    Sanofi also employed the U.S. Mail and interstate wires to provide inflated Distributor Prices to Plaintiffs and Class Members and to solicit and receive payments from Plaintiffs and Class Members for purchases of Lantus.  Those payments constituted the wrongful proceeds of the racketeering activity in which Sanofi and the PBM Conspirators engaged.

512.    The materially false and misleading representations that Sanofi made in furtherance of the Price Inflation Scheme that the Lantus Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Lantus pricing, and forestall changes to healthcare payers' historical practice of utilizing Lantus benchmark prices as a basis for prescription reimbursement.

**D.  The Damages Caused by Sanofi's Lantus Price Inflation Scheme**

513.    Sanofi's pattern of racketeering activity has directly and proximately caused Plaintiffs and Class Members to be injured in their business or property because Plaintiffs and Class Members paid artificially inflated Distributor Prices for Lantus.

514.    But for the fraudulent representations and material omissions made by Sanofi and the PBM Conspirators, and the fraudulent pricing scheme the Lantus Pricing Enterprise employed, Plaintiffs and the Class Members would have paid less for Lantus.

515.    Even though the Lantus Pricing Enterprise was operated to provide Sanofi with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Sanofi's competitors.

516.    Plaintiffs and those similarly situated were most directly harmed by Sanofi's fraud and pattern of racketeering activity.  There are no other Plaintiffs or class of plaintiffs better situated to seek a remedy for the economic harms that Sanofi's fraudulent scheme caused to direct purchasers of Lantus from Sanofi.

517.    By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi is liable to Plaintiffs and Class Members for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

## FOURTH CAUSE OF ACTION

### (Against All Defendants for Violation of 18 U.S.C. § 1962(d))

518.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

519.     Plaintiffs assert this cause of action against all Defendants for violation of 18 U.S.C. § 1962(d).

520.     As Plaintiffs allege in detail above, each of the Defendants engaged in extensive conduct that violated 18 U.S.C.  § 1962(c).

521.     Defendants' conspiracy with the PBM Conspirators was an essential element of their Price Inflation Scheme.  Each Defendant formed conspiracies with each of the PBM Conspirators to enhance the profits of Defendants and the PBM Conspirators at the expense of Plaintiff, Class Members and the Defrauded Consumers.

522.     Defendants and the PBM Conspirators agreed to work jointly to accomplish those objectives.

523.     In addition, each of the Defendants and the PBM Conspirators undertook multiple overt acts in furtherance of the shared objectives of their conspiracy.

524.     Those overt acts included the multiple acts of mail and wire fraud that Defendants and the PBM Conspirators committed, as Plaintiffs allege in detail above.

525.     As a direct and proximate result of the participation of Defendants and the PBM Conspirators in their conspiracy and the violations of 18 U.S.C. § 1962(c) that Defendants committed, Plaintiffs and the Class Members have suffered substantial financial losses.

526.     Plaintiffs and the Class Members made excessive payments to acquire Defendants' analog insulins.  In the absence of Defendants' racketeering activity and conspiracy

with the PBM Conspirators, the Distributor Prices for Defendants' analog insulins would have been substantially lower throughout the Class Period.

527.    Defendants' racketeering activity and conspiracy with the PBM Conspirators also injured Plaintiffs and the Class Members by suppressing the demand for Defendants' analog insulins during the Class Period because Defrauded Consumers could not afford to pay the inflated prices that prevailed at the retail level as a result of Defendants' fraud and conspiratorial misconduct.

528.    Plaintiffs and the Class Members are therefore entitled to an award of compensatory and treble damages and the costs of this suit, including Plaintiffs' attorneys' fees, all in amounts to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Against All Defendants for Liability Under N.J.S.A. § 2C:41-2(c))

529.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

530.    Defendants are liable persons under N.J.S.A. § 2C:41-2(c).

531.    They conducted and participated in the affairs of the Levemir/NovoLog Pricing Enterprise, the Humalog Pricing Enterprises and the Lantus Pricing Enterprise (collectively, the "RICO Enterprises") through a pattern of racketeering activity.

532.    Each of the RICO Enterprises constitutes an enterprise under N.J.S.A. § 2C:41-1c. During the Class Period, each of the RICO Enterprises was engaged in, and its activities affected, trade or commerce.

533.    As is set forth in detail above, each of the Defendants conducted or participated, directly or indirectly, in the conduct of one the RICO Enterprise's affairs through a pattern of racketeering activity.

534. Among other things, the Defendants committed repeated acts of mail and wire fraud that constituted a pattern of racketeering activity under N.J.S.A. § 2C:41-1. By virtue of that fraudulent activity, the Distributor Prices that Class Members paid for Defendants' analog insulins were artificially and fraudulently inflated.

535. As is set forth more fully above, Defendants derived substantial benefit from their pattern of racketeering activity.

536. Defendants' fraudulent conduct did not constitute normal corporate functions.

537. Plaintiffs and the Class Members were injured in their businesses and property by the pattern of racketeering activity they allege because they purchased Defendants' analog insulins at inflated prices.

538. Class Members are therefore entitled to an award of treble damages and the costs of this lawsuit, including reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**
**(Against All Defendants for Liability Under N.J.S.A. § 2C:41-2(d))**

539. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

540. Defendants are liable persons under N.J.S.A. § 2C:41-2(c).

541. Defendants conducted and participated in the affairs of the RICO Enterprises through a pattern of racketeering activity.

542. Each of the RICO Enterprises constitutes an enterprise under N.J.S.A. § 2C:41-1c. During the Class Period, each of the RICO Enterprises was engaged in, and its activities affected, trade or commerce.

543. As is set forth above, each of the Defendants conspired separately with each PBM Conspirator to further the shared objectives of the RICO Enterprises.

544.    Pursuant to that conspiracy, Defendants agreed with the PBM Conspirators that they would engage in the conduct that forms the basis for the claims that Plaintiff and the Class Members assert under the New Jersey RICO statute.

545.    Defendants and the PBM Conspirators agreed to assist one another in the planning and/or commission of those statutory violations.  They also agreed that Defendants would commit the numerous predicate acts of mail and wire fraud that Plaintiffs allege.

546.    Each Defendant, and each PBM Conspirator, undertook numerous acts in furtherance of the shared objectives of their conspiracy.  Those overt acts include the Defendants' repeated acts of mail and wire fraud and the concealment of the kickbacks that Defendants paid to the PBM Conspirators in exchange for favorable formulary placements.

547.    By virtue of the conspiracy between Defendants and the PBM Conspirators, the Distributor Prices that Class Members paid for Defendants' analog insulins were artificially and fraudulently inflated.  That conduct also suppressed the volume of the sales of Defendants' analog insulins made by Plaintiffs and the Class Members.

548.    As is set forth more fully above, Defendants derived substantial benefit from their pattern of racketeering activity and the conspiracy they entered with the PBM Defendants.

549.    Plaintiffs and the Class Members were injured in their businesses and property by Defendants' pattern of racketeering activity and the conspiracy that they entered with the PBM Defendants because all Class Members purchased Defendants' analog insulins at inflated prices and made lower sales of Defendants' analog insulins than they would have made in the absence of Defendants' illicit conduct.

550.    Class Members are therefore entitled to an award of treble damages and the costs of this lawsuit, including reasonable attorneys' fees.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members pray for relief as set forth below:

A.     Certification of the Class pursuant to Federal Rule of Civil Procedure 23, appointment of Plaintiffs as the representatives of the Class, and appointment of Plaintiffs' counsel as Class counsel;

B.     Permanent injunctive relief that enjoins Defendants from violating the federal and New Jersey RICO laws and requires them to take affirmative steps to eliminate the effects of their violations;

C.     Declaratory relief providing that Defendants' actions violated the federal and New Jersey RICO statutes;

D.     A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class Members, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

E.     Pre-judgment and post-judgment interest at the highest legal rate;

F.     The costs of this suit, including reasonable attorneys' fees; and

G.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

DATED:  September 25, 2019

Respectfully submitted,

Dianne M. Nast (NJ #012611976)
Daniel N. Gallucci
Michael Tarringer
NastLaw LLC
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
Telephone: (215) 923-9300
Facsimile: (215) 923-9302
dnast@nastlaw.com
dgallucci@nastlaw.com
mtarringer@nastlaw.com

Michael L. Roberts
Debra G. Josephson
Karen S. Halbert
Stephane E. Smith
Sarah DeLoach
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
Telephone: (501) 821-5575
Facsimile: (501) 821-4474
mikeroberts@robertslawfirm.us
debrajosephson@robertslawfirm.us
karenhalbert@robertslawfirm.us
stephanesmith@robertslawfirm.us
sarahdeloach@robertslawfirm.us

Don Barrett
Richard R. Barrett
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
Telephone: (662) 834-2488
Facsimile: (662) 834-2628
dbarrett@barrettlawgroup.com
rrb@rrblawfirm.net


Phil Elbert
Ben Aaron
Charles Barrett
NEAL & HARWELL, PLC
1201 Demonbreun St.
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573
pelbert@nealharwell.com
baaron@nealharwell.com
cbarrett@nealharwell.com